FRITTS v. KRUGH.

1. PARENT AND CHILD—PROBATE COURT—PERMANENT WARD.

An order of the probate court which makes a child the permanent ward of such court acts to sever all parental rights of the natural parents (CL 1948, § 712A.20).

2. HABEAS CORPUS—CUSTODY OF CHILDREN.

The question of the validity of a probate court order making a child the permanent ward of that court is presented by a writ of habeas corpus sued out by a natural parent seeking recovery of custody of such child which has not been adopted.

3. PARENT AND CHILD—JURISDICTION OF PROBATE COURT—NOTICE.

A notice to the natural parents of a child that the hearing on a

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 84.
[2, 13] 25 Am Jur, Habeas Corpus § 78.
[3] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 64.
  Right of parent to notice and hearing before being deprived of custody of child. 76 ALR 242.
[4] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 62.
[5, 9] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children §§ 22, 24.
[6] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 76.
[7] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 53.
[8] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children §§ 4, 7.
[10] 11 Am Jur, Constitutional Law § 97.
[11, 12] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children §§ 71, 78, 87; 39 Am Jur, Parent and Child § 26.
[14, 15] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 37; 39 Am Jur, Parent and Child §§ 20, 26.
[17] 31 Am Jur, Juvenile Courts and Delinquent, Dependent and Neglected Children § 50.
[18] 25 Am Jur, Habeas Corpus § 80.
[19] 25 Am Jur, Habeas Corpus § 160.
[20] 39 Am Jur, Parent and Child § 24.
[21] 25 Am Jur, Habeas Corpus § 10.
[22] 25 Am Jur, Habeas Corpus § 158.

petition to the probate court to take jurisdiction of the child for the purpose of putting the child up for adoption gave sufficient notice to the parents that their parental rights were at stake in the event the court found the necessary facts to establish its jurisdiction over the children, it being unnecessary for the notice of hearing to contain reference to any particular method of adoption (CL 1948, § 712A.20).

4. INFANTS—PROBATE COURT—JURISDICTION—SUFFICIENCY OF PETITION.

Mother's petition to probate court to take jurisdiction over her 2 children, then 1-1/2 and 2-1/2 years of age, which recited that her husband had quit his job, said he did not want the children, drank continually, beat her up which frightened the children, said he was leaving for his parents' home in Arkansas, that she had to have financial help to feed the children and wanted to put them up for adoption, *held*, not inadequate to allege jurisdictional facts of neglect (CL 1948, § 712A.20).

5. SAME—DEPENDENT CHILDREN—JURISDICTION OF PROBATE COURT.

The probate court had jurisdiction of the persons and the subject matter for purposes of hearing the complaint as to neglect of 2 minor children, where the children resided in the county, the essential parties had notice and the mother's petition sufficiently alleged neglect and dependency of the children (CL 1948, § 712A.20).

6. PARENT AND CHILD—PERMANENT CUSTODY OF PROBATE COURT—JURISDICTION.

A final order of permanent custody of minor children, acting to sever all parental rights, must be based on legal evidence and cannot be based on hearsay and report alone, where jurisdictional facts are in dispute, even though the statute authorizes informality of hearing (CL 1948, §§ 712A.17, 712A.20).

7. INFANTS—DEPENDENT CHILDREN—HEARING—EQUITY.

A juvenile court hearing as to neglected and dependent children is not a criminal, but essentially and legally a civil, proceeding of a chancery nature and rules of equity procedure and evidence should be followed (CL 1948, §§ 712A.17, 712A.20).

8. COURTS—PROBATE COURT—DEPENDENT CHILDREN—JURISDICTION—STATUTES.

The probate court has no inherent powers, its right to take jurisdiction of neglected and dependent children and to govern their lives being based entirely on Constitution and statute (Const 1908, art 7, § 13; CL 1948, §§ 712A.2, 712A.20).

9. INFANTS—DEPENDENT CHILDREN—PROBATE COURT—EVIDENCE .OF NEGLECT.

> There must be some testimony of neglect of a child before the probate court has the power to take jurisdiction of the child and enter a valid order of disposition of the child (CLS 1956, § 712A.18).

10. STATUTES—CONSTRUCTION.

> Statutes will be construed as constitutional wherever possible by reasonable and permissible interpretation.

11. INFANTS—PROBATE COURT—PERMANENT CUSTODY—EVIDENCE OF NEGLECT.

> The entry of an order by the probate court for permanent custody of a child due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long-run future (CL 1948, § 712A.20).

12. SAME—DEPENDENT CHILDREN—PROBATE COURT—JURISDICTION—EVIDENCE OF NEGLECT.

> An order of the probate court which took permanent custody of 2 minor children clearly exceeded the statutory authority of the court and was void, where there was no evidence of neglect, either of long duration in the past, or from which any reasonable prediction of future neglect of permanent duration could be made (CL 1948, § 712A.20).

13. JUDGMENT—PROBATE COURT—HABEAS CORPUS.

> An order affecting personal liberty which clearly exceeds the probate court's statutory authority may be attacked by habeas corpus, even where the court had jurisdiction of the persons and the subject matter (CL 1948, § 712A.20).

14. PARENT AND CHILD—FITNESS OF PARENTS—STATUTORY STANDARDS.

> The fitness of the natural parents as parents and the question of their neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered the children (CL 1948, § 712A.20).

15. SAME—DEPENDENT CHILDREN—EVIDENCE OF NEGLECT.

> There must be real evidence of long-time neglect, or serious threats to the future welfare of the child, to overthrow permanently, as distinguished from temporarily, the natural and legal right of parents of the custody and nurture of their own children, such rights not being subject to termination as a result of a brief marital dispute, or even by a temporary period of desertion by 1 of the parents (CLS 1956, § 703.6).

16. SAME—RE-ESTABLISHMENT OF HOME.

> A father whose parental rights have not been legally severed should be given society's assistance at every point in his effort to re-establish a proper home for the children for whose care he has the right and duty to provide.

17. SAME—RESTORATION OF CUSTODY—HABEAS CORPUS.

> Parents of 2 minor children, whose parental rights had not been legally severed *held*, entitled to restoration of their custody, where record shows that since mother petitioned the probate court for their custody the parents have been reunited, he has worked steadily and supported his family which now includes 2 more children, and that wife has kept house, since there has not been shown such unfitness as would have required the dismissal of the writ of habeas corpus.

18. HABEAS CORPUS—CUSTODY OF CHILDREN.

> Habeas corpus proceedings pertaining to the custody of children are essentially equitable in nature.

19. COSTS—HABEAS CORPUS—CUSTODY OF CHILDREN.

> No costs are allowed on appeal in habeas corpus proceedings in circuit court, where order restoring custody of 2 children to natural parents is modified and affirmed.

20. PARENT AND CHILD—CUSTODY OF CHILDREN—PRESUMPTION OF FITNESS—BURDEN OF PROOF.

> The burden of disproving a natural parent's fitness to have custody of his or her own child is upon the person challenging it, since there is a presumption that the parent is a fit person and the right of a parent to the custody of a child is paramount or superior to that of any other person.

21. HABEAS CORPUS—NATURE OF WRIT.

> The writ of habeas corpus is the precious safeguard of personal liberty.

22. SAME—RES JUDICATA—PREJUDICE.

> Issues decided on writ of habeas corpus would not be with prejudice to rights which the parties may have to call attention of the proper courts of facts, if any, which raise issues not disposed of on habeas corpus.

SMITH, BLACK, and VOELKER, JJ., dissenting.

Appeal from Berrien; Robinson (Thomas N.), J. Submitted October 11, 1957. (Docket No. 53, Calendar No. 46,998.) Decided October 13, 1958. Rehearing denied December 2, 1958.

Habeas corpus by Doyle A. Fritts, Sr., and Lileth Marie Fritts against Jack H. Krugh, Marguerite Krugh, Dale Wells Graham and Inez Gertrude Graham to regain custody of children taken from them by probate proceedings. Orders granting plaintiffs custody. Defendants appeal. Modified and affirmed.

*Arthur E. Leckner,* for plaintiffs.

*Gore & Williams (Charles W. Gore,* of counsel), for defendants.

EDWARDS, J.

"A judge agonizes more about reaching the right result in a contested custody issue than about any other type of decision he renders."[1]

With some significant exceptions, this is a companion case to that of *Harmsen* v. *Fizzell,* 351 Mich 86, rehearing granted March 4, 1958,[2] in which this Court dealt with a petition for writ of habeas corpus in relation to 2 children, heard before and granted by the same circuit judge because of procedural errors claimed to have been made by the same probate judge.

In this case, too, the circuit judge, after the hearing on the writ of habeas corpus, entered orders which would have the effect of removing 2 children from proposed adoptive homes where they had been placed by probate court authority and returning them to parental custody. The foster parents with whom the children have lived most of their lives to date appeal.

This story starts with the somewhat abrupt abandonment of a minor mother and 2 small children by

[1] Botein, *Trial Judge,* p 273.
[2] Opinion in rehearing, 354 Mich 60.—REPORTER.

her husband in July of 1952. The mother tells the story simply:

"My name is Lileth Fritts, and the wife of Doyle Fritts. I am the mother of Sally and Doyle Fritts, the children involved in this case. Sally was born December 19, 1949. Doyle was born December 17, 1951. I am 24. * * *

"Q. What is the date of your birth?

"A. July 25, 1931. * * *

"Q. Directing your attention to the first day of July, 1952, where were you living?

"A. Watervliet.

"Q. Michigan?

"A. Yes.

"Q. And prior to that date was your husband living with you?

"A. No.

"Q. Prior to July 1st was he living with you?

"A. No.

"Q. Did he leave you sometime before that date that you called here at the juvenile division of the probate court?

"A. Yes, he left.

"Q. And was that the result of some argument you had there?

"A. Yes.

"Q. And how long had he been away before you came down here?

"A. About 2 weeks.

"Q. And during that time did you have Doyle and Sally with you?

"A. Yes. I heard from him within the 2 weeks. I knew where he went. He went to Bald Knob, Arkansas. He had relatives there. His mother and father. To locate him I wrote his mother immediately. I had $20 while he was away. My husband gave it to me before he left.

"Q. Did you have an argument before he left?

"A. Yes.

"Q. And did he tell you where he was going?

"A. No.

"*Q.* Did he send you any money within that 2 weeks?

"*A.* No.

"*Q.* Do you remember telling the person in charge of the juvenile division of the court that you had no milk for your children?

"*A.* Yes.

"*Q.* Tell the court something about that.

"*A.* Well, I went to the law.

"*Q.* You mean the police?

"*A.* Yes.

"*Q.* Go on.

"*A.* And asked them to give me some milk and some money, but my husband paid it back.

"*Q.* Did the police at Watervliet give you some money?

"*A.* Yes.

"*Q.* And your husband paid them back?

"*A.* Yes.

"*Q.* Did you come down to the juvenile court alone?

"*A.* Yes.

"*Q.* And what happened when you went to the juvenile court?

"*A.* Well, I just went in and told Mrs. Malcolm that I wanted to put my children up for adoption; that I couldn't take care of them.

"*Q.* And did you sign anything that day?

"*A.* Yes, I signed 1 paper she made out for the children.

"*Q.* You signed a paper who made out?

"*A.* Mrs. Malcolm. I think that's what her name is.

"*Q.* The judge's name is Malcolm Hatfield; his wife is Mrs. Malcolm Hatfield. Are you talking about her, or are you talking about Mrs. Milton?

"*A.* Yes, Mrs. Milton.

"*Q.* Let the record show that. I have in my hands a file of the juvenile division of the probate court for Berrien county, which is in evidence, and on top show you a paper and ask you if your signature appears on that paper?

"*A.* Yes.

"*Q.* Is that the paper you refer to when you say you signed a paper?

"*A.* Yes.

"*Q.* Did you read all this before you signed it?

"*A.* Yes.

"*Q.* And that is what you told Mrs. Milton?

"*A.* Yes.

"*Q.* Where were your children that day?

"*A.* They was with my sister.

"*Q.* You left them with your sister?

"*A.* Yes.

"*Q.* Did you have occasion to go to the court later?

"*A.* Yes.

"*Q.* How many days later?

"*A.* I went 2 days later.

"*Q.* What was the purpose of that call?

"*A.* The same thing. I wanted to see if they was going to put them up for adoption. I knew I couldn't take care of them.

"*Q.* You asked them that?

"*A.* Yes. They told me they wanted me to sign adoption papers for the children. Two days later I signed another paper, 1 in front of Judge Hatfield, the adoption paper he wanted me to sign. This is the paper. I am speaking of, where I asked for the appointment of Hazel Wallsmith as guardian *ad litem.* That was what I signed that day. I signed the 1 in front of Judge Hatfield, July 3d. These 2. I told them how old I was.

"*Q.* Now, I show you another paper in this file which bears the signature of Lileth Marie Fritts and ask you if your signature appears on this paper which I will read.

"*A.* Yes.

"*Q.* (Reading): 'The undersigned being the mother of the said legitimate minor child and having legal authority to make and execute this consent, do hereby consent to the adoption of said child and the change of name of said child, as prayed for in petition of said court.' Did you sign that?

"*The Court:* What is the date of that?

"*Mr. Leckner:* The date is July 2, 1952; and that has to do with Doyle, and you signed another just like it for Sally?

"*A.* That's right, signed for both. Hazel Wallsmith signed that at the same time. I left Watervliet and went to my sister's after the 1st of July. I stayed there a day after he left and I stayed with her until I went back to my husband. I went back to him about 2 weeks after I gave my children up. I brought my children down here and I went to Wichita, Kansas. My husband was there."

The sworn petition signed by the mother on July 1, 1952, served to place most of these facts before the probate court:

"STATE OF MICHIGAN,
                    Cause No. . . . .
"The probate court for the county of Berrien,
                    Juvenile Division.
"In the matter of the petition concerning Sally Ann Fritts, Doyle Almo Fritts, Jr., Minor.

"I, Lileth Marie Fritts, respectfully represent that I reside in the US-12 2d house from Long's Television of Watervliet in said county, and make this petition as mother

"I further represent that said children are residents of Watervliet in Berrien county, and is now residing with and under the custody and control of mother, and father and . . . . . . was born on
                Sally, was born Dec. 19, 1949
                Doyle,            "    17, 1950
"I further represent upon information and belief that said children's father has quit his job. He has told me that he doesn't want his children. He drinks continually and beats me up which frightens the children. The father of these children said he was going to Bald Knob, Arkansas, c/o with Mr. and Mrs. Lester Fritts. I had to appeal to the police at Coloma last week for milk for the children

"I would like to put the children in an adoptive home where they will be well cared for.

"I further represent that the names, relationship, ages and residences of nearest of kin and guardian of said child ...., as I am informed and believe, are as follows:

| NAME | RELATIONSHIP | AGE | RESIDENCE |
|---|---|---|---|
| | | | Last known Probable Address: |
| Doyle Almo Fritts, Sr. | father | | Bald Knob, Ark. c/o Lester Fritts |
| Lileth Marie Fritts | mother | | going to live with Frances Bridgman, Chicago Ave. Bus (Winans Ave) Benton Harbor or to New Carlyle, Ind. c/o Mrs. Wm. Webb |

"I, therefore, pray that the juvenile court take jurisdiction of said child.

/S/ "MRS. DOYLE FRITTS
"P.O. LILETH MARIE FRITTS."

It appears clear, however, that prior to hearing upon this petition the mother rejoined her husband at his former home in Bald Knob, Arkansas, and that they then determined to seek return of their children. On receipt of notice of hearing on the adoption petition, the father wrote the probate judge:

"7–22–52

"*Mrs. Malcolm Hatfield*
"I am writing to you regarding my children Sally Ann Doyle Jr. Me and my wife have talk things over we have decided to make a home for are children. Wish to know if we could get them befor the 4th of August. If so write and let me know soon.

"Your Truly
"DOYLE FRITTS

"My add—
Doyle Fritts
5247 N. Arkansas St.
Wichita, Kansas."

And when the hearing date of August 4, 1952, arrived, Mr. and Mrs. Fritts and her mother were in the courtroom. Mr. Fritts' version of that hearing is as follows:

"After I wrote this letter to the probate judge I came to St. Joseph. I appeared in the judge's office on August 4th. The judge wrote to me and told me when the hearing would be held, so I was here. There was no stenographer in the judge's office when I appeared. There was no lawyer representing me. Nobody suggested to me that I get a lawyer. I was not sworn. My wife was not sworn. No one was sworn. I said there was no stenographer there.

"*Q.* Tell us what happened when you were in the room there?

"*A.* Mrs. Milton read the copy of the paper she had there, and when she got through reading it the judge told us within, after 6 months time, if we got along good, he would see that we got the kids back."

The report read by the county agent, Mrs. Frances Milton, recited the facts previously referred to above. Her report also detailed 3 separate conferences at which she and the probate judge had unsuccessfully attempted to dissuade the mother from her announced intention of giving up the children. The report was apparently drafted, however, before advice of the reconciliation of the parents and their decision to seek to regain their children. The report concluded:

"Recommendation: In view of the preceding, I recommend that, for the future security of these children, they be made permanent wards of this court and committed to the Michigan Childrens Institute for the purpose of that institution giving consent to their adoption."

Mrs. Milton, the assistant county agent, gave testimony pertaining to the August 4th hearing not

much different from that previously quoted from the plaintiff:

"*Q.* Now, at the time of the hearing on August 4th, I understand that you were present, Mrs. Milton?

"*A.* I was.

"*Q.* And on that occasion was Mr. Fritts present?

"*A.* I think that was the date he was present, yes. And, Mrs. Fritts and her mother from Indiana. On that occasion I read the report, in the presence of all those people. The probate judge was present.

"*Q.* And did Mr. and Mrs. Fritts say anything about the report, about the truth or falsity of it on that occasion?

"*A.* Not to my remembrance.

"*Q.* And what, if you remember, did the judge say or do on that occasion while the Frittses were there?

"*A.* Well, he talked with them awhile, and then at the end he gave his decision, and whenever—I'm not a stenographer, but whenever Judge Hatfield gave his decision at the end of anything I always asked him to repeat it slowly so that I could get it down word for word; and I read it back to him word for word so that he knew I had it down verbatim as he gave it, his decision.

"*Q.* And that happened on that occasion?

"*A.* Well, I always did that, so I am sure I did it that time.

"*The Court:* What was his decision on that occasion?

"*A.* My remembrance is that he wished to find out whether the children would adjust in the new homes to which they had been sent.

"*The Court:* They had been there a few days?

"*A.* Oh, yes. And if they didn't adjust in those homes and if at the end of a period of time, in case the children did not adjust in those homes, and if the natural parents could prove that they were capable and willing, able in every respect to give them desirable homes, then they would be the first in line to be considered."

At the end of the hearing, the probate judge entered the following order pertaining to Sally Ann and a similar one pertaining to Doyle:

"It is hereby ordered, that the said Sally Ann Fritts be and she is is hereby made a permanent ward of this court and is hereby committed to the Michigan Children's Institute at Ann Arbor, Michigan, subject to the rules and regulations governing that institution, and for the purpose of adoption.

"And it is further ordered, that should this child for any reason fail to adjust in her present environment, and should the natural parents at that time prove that they have been able to re-establish a satisfactory family life and are then able to properly care for this child, they will be first in line for the replacement of this child."

It should be noted that these orders, by making these children "permanent wards" of the probate court, if valid, acted to sever all parental rights of these parents to these children. CL 1948, § 712A-.20 (Stat Ann 1957 Cum Supp § 27.3178[598.20]).

The habeas corpus proceeding before the circuit court and this appeal before us pose the question squarely as to whether these orders were valid. (It should be noted that, although petitions are pending, no subsequent adoption orders have ever been entered.)

The trial judge's opinion found the order of the probate judge void because the notice to the parents of the hearing did not refer to commitment to the Michigan Children's Institute.

We do not agree. The notice did tell the parents that the hearing contemplated was upon the subject of permanent custody and adoption. No more specific information could have been given to tell them that their parental rights as to their children were at stake. In the event the court found the necessary facts to establish its jurisdiction over the children,

various dispositions were available to the probate judge under the statute (CLS 1956, § 712A.18 [Stat. Ann 1957 Cum Supp § 27.3178(598.18)]). It was not essential for the notice of hearing to contain reference to any particular method of adoption.

Nor do we feel that the petition upon which the hearing was based was inadequate to allege jurisdictional facts of neglect. (See *Harmsen* v. *Fizzell*, 351 Mich 86, 95–97.)

In short, we find no procedural deficiency in this record of sufficient substance to warrant the use of habeas corpus; and we note again:

"For us to pry with legal diligence at the technical crevices in old cases which pertain to child custody and adoption matters could spring open a Pandora's box of troubles." *Harmsen*, 351 Mich 86, 106.

After this much has been said, it still is true that there is revealed on this record a glaring defect of substance which undoubtedly moved the circuit judge to his basic decision in this case and which serves to justify his use of the remedy of habeas corpus.

A distinguished group of juvenile court judges has recently published a careful study of juvenile court proceedings. In it the characteristics of a juvenile court hearing are noted:

"There are 3 aspects to a juvenile court hearing, 2 of which are purely legal and the 3d socio-legal. They are: (1) the determination of jurisdiction to hear the case; (2) the adjudication of the issue of delinquency, neglect (or dependency); and (3) the determination of disposition.

"It is necessary first to determine the jurisdictional facts, *i.e.*, that the alleged act falls within the purview of the statutes fixing the court's jurisdiction of the subject matter, and that all necessary parties have been given due notice so that the requirements of due process have been met.

"Having determined that the court has jurisdiction of both subject matter and person, the court should then proceed to determine the facts." National Probation and Parole Association, Guides for Juvenile Court Judges, pp 59, 60.

We believe the probate court had jurisdiction of the persons and the subject matter for purposes of hearing the neglect complaint. The children resided in the county concerned. The essential parties had notice. The mother's petition in the instant case served to allege neglect and dependency of the 2 children. The essential facts alleged were the father's abandonment of her and them, the break-up of the family and the absence of any support for the children.

When the day set for hearing arrived, however, the probate court was on ample notice that the facts pertaining to neglect had changed materially and that the question of the court's right to take custody of these children was in dispute. In the absence of legal representation, the father's letter of July 22d should have been regarded as placing the issue of neglect in dispute.

Where jurisdictional facts are in dispute, even though the statute authorizes informality of hearing (CL 1948, § 712A.17 [Stat Ann 1957 Cum Supp § 27.3178(598.17)]), a final order of permanent custody acting to sever all parental rights must be based on legal evidence and cannot be based on hearsay and report alone. *Harmsen,* 351 Mich 86, 103; *In re Hill,* 78 Cal App 23 (247 P 591).

See, also, *People* v. *Lewis,* 260 NY 171 (183 NE 353, 86 ALR 1001); *In re Inquiry of Mantell,* 157 Neb 900 (62 NW2d 308, 43 ALR2d 1122).

"Where there is a dispute about the basic facts, adult witnesses should be sworn. Placing of children under oath should be in the sound discretion of the court, subject to statutory provisions, if any. It is

good policy to permit parents, the child, and witnesses to give testimony in narrative form with as few technical objections as possible. It should be remembered, however, that the juvenile court hearing is not a criminal, but essentially and legally a civil proceeding of a chancery nature, and the rules of equity procedure and evidence should be followed. Unimportant technicalities need not be emphasized. In addition, the judge should eliminate hearsay and accept the testimony of competent witnesses only. Guaranteeing the basic rights of the individual is a responsibility of the judge even though the child or his parents may not be aware of or claim them at the time." National Probation and Parole Association, Guides for Juvenile Court Judges, p 61.

The glaring defect in this proceeding to which we have referred pertains to the evidence (or lack thereof) presented at the hearing upon which the probate judge based his order.

We note at the outset that the probate court has no inherent powers. Its right to take jurisdiction of children and to govern their lives is based entirely on Constitution and statute. The Michigan Constitution (1908), art 7, § 13, provides that:

"In each county organized for judicial purposes, there shall be a probate court. The jurisdiction, powers and duties of such courts and of the judges thereof shall be prescribed by law, and they shall also have original jurisdiction in all cases of juvenile delinquents and dependents."

Our Michigan statute provides:

"Except as provided herein, the juvenile division of the probate court shall have: *   *   *
"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county
"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide

proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals or well-being, or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody or guardianship." CLS 1956, § 712A.2 (Stat Ann 1957 Cum Supp § 27.3178[598.2]).*

Another section provides, in cases where neglect or dependency is established, for the court to enter either temporary or permanent custody orders:

"The court in all cases involving custody shall state in the order for disposition or any supplemental order of disposition whether the child is placed in the temporary or permanent custody of the court. If the child is placed in the temporary custody of the court, no supplemental order of disposition providing permanent custody, or containing any other order of disposition shall be made except at a hearing pursuant to issuance of summons or notice as provided in sections 12 and 13 of this chapter. If the child is placed in the permanent custody of the court, all parental rights are terminated, though such rights may be reinstated by a supplemental order of disposition." CL 1948, § 712A.20 (Stat Ann 1957 Cum Supp § 27.3178[598.20]).

There must, therefore, be some testimony of neglect before the probate court has the power to take jurisdiction of the child and to enter valid order under the disposition section of the code (CLS 1956, § 712A.18 [Stat Ann 1957 Cum Supp § 27.3178(598.-18)]).

After some consideration of the problem, we distinguish here between the testimony which would afford support for an order taking temporary custody for reasons of neglect and that necessary to support a permanent custody order.

---

* Prior to the amendment by PA 1953, No 193, this matter was contained in subdivision (a)(6) of CL 1948, § 712A.2.

. Such a distinction may not be found clearly spelled out in the statute (section 20) quoted above. Yet we note the obvious unconstitutionality of the statute if facts of purely temporary neglect could suffice to support the entry of a permanent custody order severing all parental rights. Where, for example, a wholly normal family is confronted with the sudden emergency of a house destroyed by fire—the proven lack of proper shelter for the children for the next 24 or 48 hours could not, under our concept of due process, support an order of the court taking permanent custody and severing all parental rights.

We seek to save legislation from unconstitutionality wherever possible by reasonable and permissible interpretation. *People* v. *Piasecki,* 333 Mich 122; *Cady* v. *City of Detroit,* 289 Mich 499; *Thompson* v. *Auditor General,* 261 Mich 624; *Screws* v. *United States,* 325 US 91 (65 S Ct 1031, 89 L ed 1495, 162 ALR 1330); *Anniston Manfg. Co.* v. *Davis,* 301 US 337 (57 S Ct 816, 81 L ed 1143); *National Labor Relations Board* v. *Jones & Laughlin Steel Corporation,* 301 US 1 (57 S Ct 615, 81 L ed 893, 108 ALR 1352); *Ashwander* v. *Tennessee Valley Authority,* 297 US 288 (56 S Ct 466, 80 L ed 688).

. Here, we find the legislative intent plainly set forth in the use of the words "temporary" and "permanent." In accordance with that legislative intent, we hold that, while evidence of temporary neglect may suffice for entry of an order taking temporary custody, the entry of an order for permanent custody due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long-run future.

In our instant case, at the time of hearing, the probate judge had before him no evidence of neglect, either of long duration in the past, or from which any reasonable prediction of future neglect of permanent duration could be made. The order taking

permanent custody of these children clearly exceeded the statutory authority of the court and was void.

Even where, as here, a court has jurisdiction of the persons and the subject matter, an order affecting personal liberty which clearly exceeds the court's statutory authority may be attacked by habeas corpus. *In re Mills,* 131 Mich 325; *In re Allen,* 139 Mich 712; *In re Joseph Nowack,* 274 Mich 544.

See, also, *Freedman* v. *Freedman,* 303 Mich 647; *In re McKinney,* 326 Mich 190; *In re Mills,* 135 US 263 (10 S Ct 762, 34 L ed 107); *In re Bonner,* 151 US 242 (14 S Ct 323, 38 L ed 149); 25 Am Jur, Habeas Corpus, §§ 78–80, 83.

We hold that the orders entered by the probate judge taking permanent custody of these children were void for want of proof of essential jurisdictional facts of neglect.

Nor did the provisional aspect of the order serve to obviate its basic invalidity. It is totally inappropriate to weigh the advantages of a foster home against the home of the natural and legal parents. Their fitness as parents and the question of neglect of their children must be measured by statutory standards without reference to any particular alternative home which may be offered the children.

In the absence of evidence of neglect such as we have referred to, the very preamble to the sections of the probate code dealing with juveniles establishes the strong preference for parental custody.

"While proceeding under this chapter, the probate court shall be termed the juvenile division of the probate court.

"Proceedings under this chapter shall not be deemed to be criminal proceedings.

"This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, *preferably in his own home,* as will be con-

ducive to the child's welfare and the best interest of the State and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them." CL 1948, § 712A.1 (Stat Ann 1957 Cum Supp § 27.3178 [598.1]).

There must be real evidence of long-time neglect, or serious threats to the future welfare of the child, to overthrow permanently the natural and legal right of parents to the custody and nurture of their own children. CLS 1956, § 703.6 (Stat Ann 1957 Cum Supp § 27.3178[206]); *In re Goldinger,* 207 Mich 99; *Burkhardt* v. *Burkhardt,* 286 Mich 526; *Riemersma* v. *Riemersma,* 311 Mich 453. Such rights are not subject to termination as a result of a brief marital dispute, or even by a temporary period of desertion by 1 of the parents.

In *Harmsen,* 351 Mich 86, 110, we said:

"We are not unmindful of the fact that a father whose parental rights have not been legally severed should be given society's assistance at every point in his effort to re-establish a proper home for the children for whose care he has the right and duty to provide."

On the present record, there was even greater reason for society to attempt to help reunite and restore this family.

We are not unmoved by the plight of the foster parents and by the possibility 'of real damage in the lives of these 2 children. The circuit judge noted:

"The testimony taken at the hearing in this court discloses that Jack H. Krugh and Marguerite R. Krugh and Dale Wells Graham and Inez Gertrude Graham, now providing homes and care, support and education for Doyle Almo Fritts and Sally Ann Fritts, respectively, are as qualified in every respect as foster parents of said children as it is possible to

obtain. They are all giving a full measure of devotion, love and affection to these children as a spirit of unselfishness and self sacrifice that leaves nothing for challenge. The children themselves are shown to be well adjusted and happy in their present environment, fully responsive to the excellent care they are receiving from these foster parents."

It is greatly to be regretted that the original appeal from the denial of a motion to vacate the permanent custody order was not promptly brought to issue. We cannot, however, say on this record that these parents of limited education and means had ever abandoned their efforts to regain their 2 children.

We also note such testimony pertaining to recent years as bears upon the fitness of the parents. Two more brief separations of man and wife in 1955 were followed by prompt reconciliation. The basic facts appear to be that the father and mother of our 2 children have lived together in the intervening years; that he has worked steadily and supported his family; that she has kept house and borne 2 more children; and at the time of hearing before the circuit court there was a history of an intact family marred by 3 marital arguments and brief separations. We are not prepared to say that these of and by themselves suffice to prove such unfitness as would have required the circuit judge to dismiss their petition.

We regard habeas corpus proceedings pertaining to custody as essentially equitable in nature. *In re Leu,* 240 Mich 240; *Harmsen* v. *Fizzell,* 351 Mich 86. We affirm the decision of the circuit judge but remand these matters for the entry of orders allowing a reasonable time for the transfer of physical custody from the present foster parents to the parents under the supervision of the appropriate arm of the court with the purpose of occasioning as little damage as possible in the lives of these children.

Modified and affirmed. No costs.

*ADDENDUM*

In view of the important human and legal issues posed by this case and the conflicting opinions herein, those who sign this opinion desire to re-emphasize several points.

The circuit judge who heard the petition for the writ of habeas corpus found the orders of the Berrien county probate court juvenile division to be void, and in the course of our appellate process his decision on this point is before us for review. These orders were entered August 4, 1952.

Let us carefully note the state of the record before the probate court on that date. There was a sworn complaint. Its allegations of neglect and dependency were disputed by the parents who, reunited, were present in the courtroom to contest it. As far as this record discloses, no witness was called except the county agent whose report was based largely on what she had been told. Nothing resembling legal evidence was offered to establish abuse of or neglect of the children. Such *charges* as the record contains pertaining to the father's treatment of the mother have apparently never been tried in any court and, while uttered under oath in complaint form by the mother, have never been repeated by her in the husband's presence with right of confrontation and cross-examination. In effect, the mother's own statements about her husband in the midst of a marital dispute repeated in hearsay form have been employed to defeat her own efforts to regain custody of her children. We reiterate that where the fundamental facts of neglect are in dispute, our Constitution and statute require some legal evidence to support the court's assertion of jurisdiction.

We again make reference to the disputed orders which we have previously held void:

"It is hereby ordered, that the said Sally Ann Fritts be and she is hereby made a permanent ward

of this court and is hereby committed to the Michigan Children's Institute at Ann Arbor, Michigan, subject to the rules and regulations governing that institution, and for the purpose of adoption.

"And it is further ordered, that should this child for any reason fail to adjust in her present environment, and should the natural parents at that time prove that they have been able to re-establish a satisfactory family life and are then able to properly care for this child, they will be first in line for the replacement of this child."*

The concept of the relationship of his court to the family entertained by the probate judge, and exemplified in his orders, is one for which we find no warrant in the law of this State or, for that matter, any one of these United States.

It will be noted that these orders do not indicate a final judgment on the part of the probate judge on the facts presented to him that the parents are either unable, unwilling or incapable of offering a proper home and guardianship to these children. On the contrary, the orders on their face suggest the conclusion that, while the parents may well prove to be proper custodians for their own children, the probate judge had, in his view, succeeded in finding parents for each of them who were superior to those whom nature and the Deity had provided.

We have previously noted the strong preference for parental guardianship in the prefatory paragraph to the juvenile sections of our probate code and in our Michigan case law. In a recent case, the supreme court of Minnesota phrased this preference thus:

"It is too well settled to require citations that the right of a parent to the custody of a child is paramount or superior to that of any other person; that a mother is presumed to be a fit and suitable

---

* A similarly-worded order was entered in relation to Doyle Fritts.

person to be entrusted with the care of her child; and that the burden of disproving this presumption rests upon the person challenging it." *In re Larson,* 252 Minn 490 (91 NW2d 448, 453).

We believe that no such discretion as these orders seem to assert is vested by the law of this State in a probate judge sitting in the juvenile division, absent facts upon which a finding could be made, that the natural and legal parents of a child had become incapable of discharging the duties of parenthood according to the accepted standards of society, or had by their own conduct so neglected, abused or abandoned their children as to constitute an abdication and waiver of their rights of parenthood.

In our view, the orders entered were beyond the statutory power conferred upon the probate judge and were void. In the language of our habeas corpus act, "the jurisdiction of such court * * * has been exceeded." CL 1948, § 637.29 (Stat Ann § 27.2272).

We now turn to the concept of the writ of habeas corpus at issue in this case. There is no need to recite the great use in the history of the development of freedom which the courts have made of this writ of last resort. Nor do we think our State or nation have reached such a point of civilized development that the powers exercised under this writ should now be narrowly circumscribed.

The suggestion is made to us that the court which hears a writ of habeas corpus and finds a court order offered in justification of the detention or deprivation of freedom concerned, may only inquire as to whether or not the other court had jurisdiction in the narrow sense of (1) jurisdiction of the persons; and (2) jurisdiction of the subject matter of the dispute. This view would have the advantage of resolving many past varying usages of the word "ju-

risdiction." But it has the disadvantage of depriving the courts in a hearing on a writ of habeas corpus of the power to strike down an unjust order which is patently *ultra vires,* or an order entered in obvious violation of constitutional rights. The United State supreme court has many times, in cases of great historic importance, employed a broader concept of the power of habeas corpus. *Ex parte Lange,* 18 Wall (85 US) 163 (21 L ed 872); *Hans Nielsen, Petitioner,* 131 US 176 (9 S Ct 672, 33 L ed 118); *Moore* v. *Dempsey,* 261 US 86 (43 S Ct 265, 67 L ed 543); *Johnson* v. *Zerbst,* 304 US 458 (58 S Ct 1019, 82 L ed 1461, 146 ALR 357); *Bowen* v. *Johnston,* 306 US 19 (59 S Ct 442, 83 L ed 455); *Walker* v. *Johnston,* 312 US 275 (61 S Ct 574, 85 L ed 830); *Wade* v. *Mayo,* 334 US 672 (68 S Ct 1270, 92 L ed 1647). This Court has likewise employed the same broad view of the powers of the writ of habeas corpus. *In re Mills,* 131 Mich 325; *In re Allen,* 139 Mich 712; *In re Nowack,* 274 Mich 544; *Freedman* v. *Freedman,* 303 Mich 647; *In re McKinney,* 326 Mich 190; *In re Maddox,* 351 Mich 358.

In discussing arguments for restrictions upon the use of the writ of habeas corpus, Mr. Chief Justice Hughes said:

"But the rule, often broadly stated, is not to be taken to mean that the mere fact that the court which tried the petitioner had assumed jurisdiction, necessarily deprives another court of authority to grant a writ of habeas corpus. As the court said in the case of *In re Coy,* 127 US 731, 757, 758 (8 S Ct 1263, 32 L ed 274), the broad statement of the rule was certainly not intended to go so far as to mean, for example, 'that because a Federal court tries a prisoner for an ordinary common-law offense, as burglary, assault and battery, or larceny, with no averment or proof of any offense against the United States, or any connection with a statute of the United

States, and punishes him by imprisonment, he cannot be released by habeas corpus because the court which tried him had assumed jurisdiction.' Despite the action of the trial court, the absence of jurisdiction may appear on the face of the record (see *In re Snow*, 120 US 274 [7 S Ct 556, 30 L ed 658]; *Hans Nielsen, Petitioner*, 131 US 176, 183 [9 S Ct 672, 33 L ed 118]) and the remedy of habeas corpus may be needed to release the prisoner from a punishment imposed by a court manifestly without jurisdiction to pass judgment.

"It must never be forgotten that the writ of habeas corpus is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired. *Ex parte Lange*, 18 Wall (85 US) 163 (21 L ed 872)." *Bowen v. Johnston*, 306 US 19, 26, 27 (59 S Ct 442, 83 L ed 455).

We hold that the orders entered upon the record of this hearing, as certified to us by the participating parties, represented an erroneous concept of the power conveyed by statute upon the probate court sitting in juvenile division, and that, being based upon no evidence of permanent neglect, they represented a fundamental miscarriage of justice as to these petitioners and exceeded the statutory powers of the probate judge who entered them.

As indicated previously, we likewise hold that a permanent deprivation of parental rights, based upon the record certified to us here, would represent, if authorized by statute, a violation of due process of law as far as these parents are concerned.

We believe that these petitioners presently have no other remedy than the petition for the writ here considered. The suggestion that a motion to restore parental rights once lost is the equivalent of the right to contend that such rights were severed in violation of both statute and Constitution does not in our view require more than the noting of our disagreement.

We have previously indicated that after determining the legal issue pertaining to the permanent custody orders attacked by the writ of habeas corpus before him, the circuit judge had the additional duty, since habeas corpus proceedings in relation to custody of children are essentially equitable in nature, to concern himself with the welfare of the children as of the time he heard the case. We find no reason upon the record written before him to hold that he failed in his duty in this regard.

It is, of course, obvious that what we decide in relation to this case becomes *res judicata* only as to the issues which were litigated and decided at the circuit court hearing on the petition for writ of habeas corpus, and that it constitutes no prejudice to any rights which the parties may have to call the attention of the proper courts to facts, if any, which raise issues not disposed of there.

DETHMERS, C. J., and CARR, and KELLY, JJ., concurred with EDWARDS, J.

SMITH, J. (*dissenting*). We would do well to take a hard second look at what is proposed here.

It is proposed that we hold to be "void" the order made by the probate court respecting these unfortunate children who, in their short lives, have known so much of what some of us would describe as neglect. It is proposed, let us stress, not that we find the determination of the probate judge to be merely erroneous, but to be utterly void. We are to hold that it is a complete nullity. A "void" judgment, as we all know, grounds no rights, forms no defense to actions taken thereunder, and is vulnerable to any manner of collateral attack (thus here, by habeas corpus). No statute of limitations or repose runs on its holdings, the matters thought to be settled thereby are not *res judicata,* and years

later, when the memories may have grown dim and rights long been regarded as vested, any disgruntled litigant may reopen the old wound and once more probe its depths. And it is then as though trial and adjudication had never been. It is no answer to say that such things cannot happen in a modern society, particularly where the security of children's lives is involved. This case speaks for itself. Sally Fritts, one of the children before us, was 2-1/2 years of age when her mother petitioned to put her children "in an adoptive home where they will be well cared for." The situation at that time may be gleaned, in part, from the report of the investigation for adoption, made by the assistant county agent. It states, in part, as follows:

"The father was a drinker and left his family more than once. The mother tried several times to give her children away. At last she just left them crying in the office of the juvenile division of the probate court. She said that she would not keep them if she had money."

At this writing Sally is almost 9 years of age. Most of her life has been spent in the home she now knows and but few years of childhood remain. The plight of the mother at the time of giving up her children was tragic beyond words. But is it within our power to salve those wounds after these many years? Are we now to re-create her tragedy in the lives of the children? And what of the situation of those who have cared for these children through the long years of infancy?

This, then, is our problem. Mr. Justice EDWARDS holds that the order of the probate court taking permanent jurisdiction of these children was entered without "jurisdiction" and therefore "void." It would be well to keep constantly before us that this is the one situation above possibly all others

in the law in which the orders of a court should be vested with every security and finality at our command, namely, that involving the care and custody of children. Yet it is to this very situation that it is proposed to apply the most devastating weapon in the entire legal armory, the doctrine of lack of jurisdiction, of complete invalidity, of nullity. We cannot agree. Not only are we satisfied as to the evidentiary showing made in this particular case, but we are keenly aware of the force of precedent and have no wish to jeopardize the security of past and present custodial orders by the holding that a subsequent disagreement, on our part, with the probate court, on the sufficiency of the proofs of neglect (or like question) means that the probate court had no jurisdiction, and that its order was void, and is subject to collateral attack at any time. This is not to say that errors made by the courts of original jurisdiction may not be corrected. There is an orderly process of appeal provided for these matters and it should be timely utilized. We are not confronted, then, with the situation in which the only practicable avenue of redress was the great historic writ of habeas corpus. What is sought here is simply the substitution of the writ of habeas corpus for the right of appeal under the statute, or, at the election of these parents, for the right enjoyed by them to apply at any time in probate court for a new or supplemental order of disposition. It is proposed, simply, that we approve the habeas corpus because, it is said, the evidence upon which the probate court acted was so weak that it had no jurisdiction to enter the order and, hence, it was "void." The cost of what is here proposed, in terms of human interests involved, is staggering. How many other custodial orders may likewise be called "void" after many years have passed without appeal we have no way of knowing. Much would de-

pend upon the strictness with which we might view the showing made. We are now, however, disposed to undertake that experiment.

Just what is this error so all-pervading that its commission makes a nullity of the court's process? The circuit judge pointed to irregularities in the procedures employed by the probate judge. These, however, were not jurisdictional. On this phase of the case I agree with the careful analysis of Mr. Justice Edwards. The probate court did, in spite of such, obtain jurisdiction over the persons and over the subject matter. Where, then, lies the error so pernicious as to make the probate order a nullity? According to Mr. Justice Edwards there is a "glaring defect" in the evidence "presented at the hearing upon which the probate judge based his order." And what is this glaring defect? There was, we are told, insufficient evidence of neglect.

So, just at this point, we reach the crux of the case: There is a difference of opinion between some of our Court and the probate court on the sufficiency of the evidence of neglect. We will assume, *arguendo,* that there was such a deficiency, that our brethren so believing are right, although we are keenly aware that we are the Supreme Court not because we are always right but that we are always right because we are the Supreme Court. At any rate, the probate court, we will assume, was in error. Mr. Justice Edwards holds that this makes its order "void," that the court lost jurisdiction, that its order was a nullity, in short, that all that was done amounted to no more than a pompous, cruel travesty of make believe. Not merely are we to hold the order erroneous, we emphasize, subject to correction as all other errors in the law are corrected, but void. And this with respect to a matter (*i.e.,* was there "neglect"?) with respect to which wide differences of opinion may honestly exist among reasonable and sincere men,

and with respect to a branch of the law (the welfare of children) in which the most pressing need for security of adjudication exists.

The case before us well illustrates the pitfalls lurking in every step of the path proposed. At the time of the hearing on August 4th, the probate court had before it a sworn petition by the mother that the father did not want his children, that "he drinks continually and beats me up, which frightens the children," that the father had left them and that she had found it necessary to go to the public authorities for aid. He had also the report of the assistant county agent that "this is not the first break-up which the Fritts family has undergone. It appears that there has been trouble during most of their married life. The pattern of constant discord is there. On the information which has been gathered, it would appear that if the parents do live together, the discord would be a most pernicious influence on their children. If the parents do not live together, the children would have no security."

But not only did the probate judge have before him at this hearing these instruments, with their authors, but he had the parents themselves, and while we do not know precisely what transpired, since no stenographic notes were taken, we do have transcribed a hearing dated September 16th, at which the hearing of August 4th was explored in detail. At no time upon this date (September 16th) did Mr. Fritts see fit to refute the charges made against him, a course of action which would seem to suggest itself to any normal person who had been slandered thereby. As to the marital discord, which my Brother would confine to isolated instances, we find in the record of September 16th the following (the assistant county agent is on the stand):

"*Q.* Do your records disclose that Mr. Fritts told you prior to the hearing he wanted his children back?

"*A.* Yes, he called me. I made an appointment with him; he came over and said he wanted to get the children back. They admitted their family life had been a history of discord but they planned to do better."

The fruition of their plans to do better may be judged, in part, by the fact that Mrs. Fritts, while in Kansas, and less than a year before the habeas corpus hearing, petitioned for divorce on the grounds of "gross neglect of duty and extreme mental cruelty," and obtained a court order restraining Mr. Fritts from molesting her. This was on January 13, 1955. On June 25th, she was back in court, asserting that she, relying on his promises, "took him back and they again lived together as man and wife" but that, subsequent thereto, he was again guilty of "gross neglect of duty and extreme mental cruelty toward the plaintiff," and again she obtained a restraining order. We observe, also, that in the hearing on September 16th, Mrs. Fritts confirmed the truth of the matters alleged in her petition, coupling this, however, with the assertion that she wanted the children returned to her. Finally, with respect to this hearing, in view of the fact that the judgment of the probate judge is assailed as being so utterly lacking in foundation as to render his order void, we think, in all fairness to him that his statement made at the close of the hearing should be made a part of our opinion:

"This mother has, with substantial cross-examination, brought out what happened and I want her to know this, that we followed her wishes all the way through in placing those children in identically the kind of home she wanted after trying to dissuade her from this action on 3 different occasions. The point

I want her to know is that the children would suffer greatly if they were moved at this time. I don't want to give an opinion now."

If in all of these charges, repeated and undenied, before the probate judge on August 4th, and the reports then available to him, there is not sufficient evidence of "neglect" the word has a poverty of meaning heretofore unknown to us. In this respect, Mr. Justice Edwards holds that "at the time of the hearing, the probate judge had before him no evidence of neglect, either of long duration in the past, or from which any reasonable prediction of future neglect of permanent duration could be made." The emphasis here is apparently upon time, upon the elements of "long" duration and "permanent" duration. The difficulty with the distinction sought to be drawn, emphasized as it is with respect to temporary and permanent orders, is that we cannot define how long long is. How many times must the mother be required to appeal to the public authorities? How many times must the children go hungry? How often must the children witness the mother's beatings? The criterion, in our opinion, depends not upon the clock or calendar but upon all of the surrounding circumstances, the nature of the act or acts, the conditions under which committed, the provocations or lack thereof, and all of the many-colored hues going to make up the spectrum of life.

This determination I would leave in the trier or triers of the facts to whom jurisdiction is confided by statute. But when all is said and done (and here lies the point of my difference with Mr. Justice Edwards), the decision of the probate judge upon the issue of neglect remains a matter to be corrected if in error, but not of *jurisdiction*. If he is wrong, if he makes a mistake, indeed, if he blunders, it is only that and nothing more. If he has jurisdiction of the

parties and of the subject matter he does not lose it by making a mistake, for he has jurisdiction to make mistakes. (*Buczkowski* v. *Buczkowski,* 351 Mich 216.)

We need not, we assume, protest our jealousy of the rights of natural parents to their children. But these rights are not indestructible by the parents themselves. The parents may, by their own acts of cruelty or degradation, forfeit rights that we, under other circumstances, would protect and implement by every resource at our command. The beatings administered the mother by the father of the children may be suffered by the mother with whatever philosophy and fortitude she can muster. But we are not prepared to say that exposure to the spectacle, in addition to the balance of the matters shown, cannot constitute neglect of the moral welfare of the children. The persistence of reprehensible home conditions to a period only shortly antedating the hearing in habeas corpus is more than suggested by exhibits A, B, C and D, the instruments from the district court for the county of Sedgwick, Kansas, in which Mr. and Mrs. Fritts were then residing, petitioning for divorce and for an order restraining her husband from molesting her.

The question here under examination, whether an erroneous (even conceding it to be such) finding of neglect results in a "void" order, on the theory that the court thus lost "jurisdiction" because of its error, had recent examination by one of the distinguished courts of the nation, the court of appeals for the District of Columbia, then comprising Justices Edgerton, Stephens, and Rutledge. This court, in the case of *In re Stuart,* 72 App DC 389 (114 F2d 825), had under consideration an appeal from a judgment (of the juvenile court of the District of Columbia) that a child "was without adequate parental care and support and that she should be placed under the

guardianship of a certain person." · The. court, after reviewing the proceedings and the evidence, concluded that the findings of inadequate parental care and the order transferring the child's custody were without warrant in the evidence. With respect to the issue before us, that of jurisdiction, the court held as follows (pp 833, 834):

"By way of further clarification of the meaning of the act we comment upon an argument of the appellant: It is said in the appellant's brief: 'Jurisdiction of the juvenile court under the act * * * is dependent upon the evidence and in this case the evidence shows no such lack of parental care and support as would give the juvenile court jurisdiction to make appellant a ward of the court.' And throughout the oral argument of the appellant it was insisted that the juvenile court was without 'jurisdiction' to make the order appealed from.

"While it is sometimes loosely said that a court has no 'jurisdiction' to make an order not supported by the evidence necessary to prove the cause of action set forth in the complaint which invokes the action of the court, it is important to point out, for the sake of clarity in respect of the power of the juvenile court, that in the proper sense of the word jurisdiction a court has jurisdiction, in the sense that its erroneous action is voidable only and not void, when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the complaint is not obviously frivolous. *Binderup* v. *Pathe Exchange* (1923), 263 US 291, 305, 306 (44 S Ct 96, 68 L ed 308); and see *Howat* v. *Kansas* (1922), 258 US 181, 189 (42·S Ct 277, 66 L ed 550); *Cooper* v. *Reynolds* (1870), 10 Wall (77 US) 308, 316 (19 L ed 931); *Brougham* v. *Oceanic Steam Navigation Co.* (CCA 1913), 205 F 857, 859; *Hughes* v. *Cuming* (1900), 165 NY 91, 95 (58 NE 794). In this proper sense of the word jurisdiction the juvenile court in the instant case had jurisdiction to make· the order

appealed from. The parties were before it, the case described in the petition was within the class of cases which the act gives the court power to deal with—to-wit, a case involving a question of adequate parental care of a person under the age of 18—and the petition on its face stated a cause of action. That the evidence failed to support the petition did not affect the jurisdiction of the court, in the proper sense of the term, to hear the cause and to make the order. But it did, as we have pointed out above, make the action of the court erroneous and subject to reversal on appeal."

The decision is eminently sound. The loose use of the word "jurisdiction" as synonymous with "error" can only serve to introduce untold confusion in the law. *Buczkowski* v. *Buczkowski, supra.* Thus, as we write, we find in the record of an automobile-accident case now before us the assertion made to the trial court (upon objections made to jury charges) that such court "was without jurisdiction in the matter, after having denied defendant's motion for a directed verdict ⁎ ⁎ ⁎ to charge the jury that, as a matter of law, Mr. —— was guilty of negligence."

If by this it is meant that the trial court, having jurisdiction of the parties and the subject matter, lost such jurisdiction because of the allegedly erroneous charge, it is complete and utter nonsense. A court, having jurisdiction, does not lose it by erroneously charging, by erroneously directing a verdict, or as here by (allegedly) erroneously entering an order respecting custody.

We have not, in the above, weighed the merits of the respective parents. We have not matched, as in the prize ring, the claims of the distraught natural mother, whose feelings as she abandoned her children are probably beyond our full understanding, against those of the foster mothers, as they embrace, awaiting our decision, those children who, as has been said, grew in their hearts rather than under

them. We have not done these things because, although their tragedies are not remote from us, our primary concern is the welfare of the children.

Let there be no misunderstanding in anyone's mind about the lack of justification for what the majority is here doing. We are not acting under the whip of an inexorable statute which we have neither the will nor the wit to interpret, for there is no statute commanding this result. The common law does not demand it. Apt precedent denies it. Why, then? Simply and solely because of our majority's stumbling over one of the most basic concepts known to the law, that of "jurisdiction" to hear and decide. This concept, if misapplied, is so perilous to the stability of the judicial process, to the principles of *res judicata,* that we recently in a unanimous opinion warned the profession against its loose use. We cautioned not to confuse a court's reaching the "correct" result with its jurisdiction to hear and decide. We pointed out that a court having jurisdiction of the parties and the subject matter has also the jurisdiction to err. Having said all of this in *Buczkowski, supra,* a few scant weeks ago, we now plunge into the very pit over which we posted the warning and we drag the Fritts children in with us.

We will climb out, of course. The sun will not set on this day before we will be forced to devise ways first to distinguish, then to repudiate, then to bury, this case as authority. No court can live with the proposition that jurisdiction to hear and decide depends upon evidence sufficient to justify the remedy prayed, for we do not reach the question of remedy in the matter before us until we have crossed the bridge of jurisdiction. But what, in the meantime, of these children? Are they never to know surcease from sorrow? Were their cups not filled to overflowing 6 years ago? Are we now to add the hemlock?

. ' The circuit judge was in error in deciding that the probate court did not have jurisdiction of the matter before it. The writs issued in circuit should therefore be dismissed, without costs.

BLACK and VOELKER, JJ., concurred with SMITH, J.

BLACK, J. (*dissenting*). I make bold to say that, on review here of habeas corpus proceedings instituted for the purpose of determining custody of children of tender years,* our first act should be that of self-appointment of this Court as a sort of temporary guardian of the rights and interests of the diminutive and tragically interested party or parties for whom—as a rule and as here—no counsel appears. In this case the natural parents (formerly of Arkansas, late of Michigan, and now of Kansas) vie with the would-be adoptive and 6-year-continuous foster parents for immediate as well as final custody of 2 little children. In the shadowed valley between these grimly contentious forces walk the innocent and utterly defenseless sister and brother known in this record as Sally Ann and Doyle Almo Fritts. We may well liken their position to that of Hansel and Gretel in the forest. No guardian or counsel stood by their side in the courts below. None speaks to us now in their separate behalf. Send well to this Court, in all good time, the courage and the wisdom with which to confess the error of today's myopic majority, thus to attend the welfare and legal rights of the two. And grant that, before the inevitably ultimate right of this case comes to final if belated judgment, Sally and Doyle Fritts are still within reach of orderly process to be issued by the

---

* This case concerns the jurisdiction of Michigan probate courts, sitting in juvenile division, under the act of 1944, as amended (PA 1944 [1st Ex Sess], No 54). By the act a new chapter, "to stand as chapter 12A thereof," was added to the probate code of 1939. In this opinion I shall refer to the chapter by section numbers. The official chapter citation is CL 1948 and CLS 1956, § 712A.1 *et seq.* (Stat Ann 1957 Cum Supp § 27.3178 [598.1] *et seq.*).

Berrien county probate court in accordance with such final judgment.

I fully agree with the reasoning of Mr. Justice SMITH and join him in concluding that these writs of habeas corpus should be dismissed. There is more to be said, however, lest as the impending legal storm rages, as it surely will over today's wholly indefensible decision of a bare foursome sitting here, these youngsters are spirited beyond our borders and beyond effective recall of that order of recant (however mincing and equivocal it may be) we are sure to enter when the impact of majority decision becomes known in Michigan probate courts and is fully realized in our conference room. This Court and our people will never be able to live with the incredible and blindly posted doctrines the undersigned do now reject, and the only question is one of time; time when 4 of our Brothers perceive—and act to correct—their grievous folly.

Cardozo tells us that judges "march at times to pitiless conclusions under the prod of a remorseless logic which is supposed to leave them no alternative;" that they "deplore the sacrificial rite" and perform it with averted gaze, "convinced as they plunge the knife that they obey the bidding of their office." (The Growth Of The Law, p 66.) My Brothers surely march thus here, not fully realizing what they do. Would that the Constitution required each member of this Court to personally witness the heartsickening scene of execution of today's majority sentence; that of tearing 2 fear-stricken little ones from the only homes of love and care they know or remember. We might in such case recall these writs on the spot, leaving a jury to determine that which of right should be settled in Berrien county's circuit court juryroom.

Aside from the impact of today's sentence on these children. what is it that appalls us (we who have studied the *partial record* on which today's majority

has written plus the *remaining record* our minority has seen fit, since submission of the case, to bring here from the Berrien county clerk's office)? It is this precise and decidedly aberrant determination of the majority:

That a Michigan court of record concededly may have jurisdiction of the parties and subject matter brought before it in an entirely proper statutory proceeding (noncriminal in nature*) and yet, before the day of hearing is over and for want of what to our majority is a sufficient record of supporting proof, *lose jurisdiction to proceed to judgment* (the judgment whether tainted with error or otherwise being quite within scope and range of the statute under which court and parties have assumed to proceed) *and, at the same time and by force of the same allegedly deficient record, lose jurisdiction over the subject matter* (in this case the protection and welfare of infants who, in their own unrepresented right, are entitled to continued exercise of that jurisdiction to the point of final judgment or attainment by them of age 17).

Today's error will spread its inescapable contagion beyond the confines of Berrien county to the outermost boundaries of Michigan. Until we proceed to inexorable self-correction, a menacing cloud of jurisdictional doubt will have been cast upon every order hitherto issued, in juvenile division of probate (on strength of which supposedly final and happily concluded adoption proceedings may depend), where the record discloses a paucity of proof, or a dissatisfactory record of proof, or an absence of "real evidence of long-time neglect," supporting such order. And this our majority proceeds to do in the face of an ignored section of the statute declaring that the

---

* Section 1 of said chapter 12A specifically declares that "Proceedings under this chapter shall not be deemed to be criminal proceedings."

hearing in question may be informal; that "steno-graphic notes or other transcript" need be taken or made only when requested by counsel or ordered by the court, and that "the general public may be exclud-ed" from such hearing (section 17 of said chapter 12A).* Ah, yes, we must find a way to unfetter this habeas corpus proceeding from the hard-to-get-around and already firmly seated jurisdiction of the juvenile division over these children. The only way is the way of necessity, and we shall pursue it to sentence of the children even though necessity knows no law. Thus,

"Man, proud man,
Drest in a little brief authority,
Most ignorant of what he's most assured   *   *   *
Plays such fantastic tricks before high heaven
As makes the angels weep."

(Isabella's denunciation of the sentencing judge in Measure For Measure, act 2, sc 2, lines 117–122.)

This case will be known in future years as Michi-gan's judicial wosbird of 1958—the occasion when 4 members of the Supreme Court of Michigan sen-tenced 2 sinless little children to a strange and por-tentously darkened life in a faraway State without pretense of providing them with the fundamental rights—to counsel and jury trial—we guarantee to the meanest of our adult citizens. Withal, the pro-fessed concern of my Brothers, for the welfare of the innocents they now condemn, is positively chilling. I turn to the record facts, including those—brought here since submission of the case—my Brothers would ignore.

Sally Ann Fritts was born at Little Rock, Arkan-sas, December 19, 1949. Doyle Almo Fritts was born

---

* In this case, and certainly by permission of the statute, no steno-graphic record of the hearing on August 4, 1952, was taken or made. No wonder the "record" isn't letter perfect.

at Watervliet (in Berrien county), December 17, 1950. In July of 1952—this my Brothers in majority concede—the Berrien county probate court, sitting in juvenile division, became vested with statutory jurisdiction over Sally and Doyle on account of the outright tragedy of the father's neglect and desertion and the repeatedly presented plea of the mother that they receive care from the court she could not give, followed by the statutory steps my Brothers have related.   They—the mother and children—had no food and the children needed milk.   The little boy, then less than 2 years old, was suffering from impetigo and was in need of immediate medical care. The distraught mother declared to the juvenile division that she was unable to care for them and that she wanted "to put the children in an adoptive home where they will be well cared for."   On the third occasion, when she sought aid in the probate office, the mother left the children there, the latter crying their forlorn grief, saying "Well, I'm leaving them anyway."   This, to the undersigned, amounted to utter abandonment of forsaken waifs, yet it suggests no criticism of a desperate mother.   She had little alternative and was quite destitute.   The father—petitioner here for release of our gracious writs of habeas corpus—had deserted the whole family and had gone back to his original home at Bald Knob, Arkansas.

So the juvenile division proceeded to statutory hearing and entry of the orders my Brothers pronounce jurisdictionally defective.   Such orders were entered under date of August 4, 1952.*   In form they

---

* August 18, 1952, the parents filed a petition (obviously authorized by section 21 of said chapter 12A) to set aside the orders of August 4th.   Such petition, after full hearing with the parents represented by counsel, was denied September 27, 1952.   The parents thereupon filed certain papers in probate looking toward appeal from the order of denial but did not pursue such appeal further.   This abandoned appeal of 1952 is the one to which my Brother Edwards refers (ante, p 117).

duplicate the juvenile division order considered in *In re Snyder,* 328 Mich 277, which order was reversed on appeal to circuit, and confirmed as against such reversal on appeal to this Court, with no question raised by anyone—including any member of this Court—as to jurisdiction of the juvenile division to enter such "permanent" order.

The record of Mrs. Fritts' troubles, since she rejoined her husband at Wichita, Kansas, is replete with more evidence upon which a constituted trier or triers of fact (distinguished from a court hearing jurisdictional questions in a habeas corpus proceeding) might well conclude that a return of custody to these parents is not yet in order.* On January 14, 1955, Mrs. Fritts filed her petition for divorce against Mr. Fritts in the district court of Sedgwick county, Kansas, alleging parentage of Sally Ann, Doyle Almo and Jimmy Dale (born since the probate hearing of 1952); alleging neglect of duty and cruelty on the part of Mr. Fritts, and alleging that her husband "should be restrained and enjoined from molesting or annoying the plaintiff at any time." The district court thereupon issued its order restraining Mr. Fritts from molesting or annoying Mrs. Fritts, as in her bill prayed, and ordered him to pay a biweekly amount for "temporary child support and alimony" plus attorney fees. On June 24, 1955, Mrs. Fritts filed an amended petition, alleging birth of a fourth child (Ronald Leslie) and alleging further as follows:

"That on January 14, 1955, plaintiff filed a petition for divorce against the defendant; that after defendant promised the plaintiff that he would discontinue his acts which constituted extreme mental cruelty

---

* The point made here, and I shall come to it later, is that there as yet has been no trial of the merits of the pending statutory petition by which these parents ask restoration to them of custody of these children.

and gross neglect of duty, plaintiff, relying upon these promises, took him back and they again lived together as man and wife."

In her amended petition Mrs. Fritts went on to allege:

"That plaintiff, since taking her husband back has performed each and every duty devolving upon her as the wife of the defendant but he, disregarding his duties, marriage vows and promises, has been guilty of gross neglect of duty and extreme mental cruelty toward the plaintiff."

This record of continued marital discord, save only as testified later in relation to what obviously was a shaky reconciliation of the parents (see opinion of Mr. Justice EDWARDS on this), is the only information this appellate Court has before it, in this year 1958, on strength of which we are asked to approve transfer of child custody—by habeas corpus thwarting direct and pending appeal—from excellent homes and foster parents within our jurisdiction to a troubled home beyond reach of our process. Convinced that the proper forum for enlightened and legally rightful determination of such critical issue has not as yet been utilized and that it stands open to all interested parties (in the Berrien county circuit court), I will have no part in any such abuse and misuse of our constitutional writ.

*First: The question of jurisdictional validity of the probate court orders of August 4, 1952.*

Mr. Justice SMITH has considered this question at length. Fully agreeing with his views, I am moved to add this: So long as jurisdiction to enter a "supplemental order of disposition" continues (and such jurisdiction of the juvenile division remains intact to this day, so far as concerns Sally and Doyle Fritts, regardless of validity of the orders of August 4th), no order—entered in juvenile division—may proper-

ly be termed as "severing all parental rights" (the quoted expression is that of Mr. Justice EDWARDS).* This I think was made plain, even to the legally unskilled, by the grant of continuing jurisdiction to issue supplemental orders "at any time while said child is under the jurisdiction of said court," which grant the reader will find in dovetailed seriation as shown by sections 19, 20, 21 and 24 of said chapter 12A. Indeed, the very section my Brothers in majority rely upon echoes this necessary—when we consider the rather manifest need for continuity of jurisdiction in such cases—declaration of legislative intent. That section (section 20) concludes: "If the child is placed in the permanent custody of the court, all parental rights are terminated *though such rights may be reinstated by a supplemental order of disposition.*" Perforce, there is no finality of any order when the order itself, by command of a self-incorporating statute, is made subject to the retained and continuing power of the court to "affirm, modify, or set aside" any and all such orders. Witness the complementing and cooperative provisions of sections 20 and 21 of the statute. The fate of a child in our courts is not—or at least should not be—a life or death single shot at the apple on the youngster's head like, say, the one opportunity of driving home a mechanic's lien. The statute, referring to said chapter 12A, says just that. So does even a soupcon of common sense.

Even an unanimous determination of this Court, of jurisdictional invalidity of the 2 orders of August 4th, would in no manner support these misguided

---

* Such an order—finally "severing all parental rights"—may of course be entered with the effect provided by section 9 of chapter 10 of the probate code (CLS 1956, § 710.9, Stat Ann 1957 Cum Supp § 27.3178 [549]), as last amended by PA 1957, No 255, pertaining to adoption proceedings. No such order has as yet been entered in the pending proceedings (in Berrien probate) looking toward adoption of Sally by Mr. and Mrs. Graham and adoption of Doyle by Mr. and Mrs. Krugh.

writs of habeas corpus. The juvenile division admittedly was possessed of jurisdiction over Sally and Doyle when the hearing of August 4th commenced. If its orders of that day were void for any reason— and this I vigorously dispute—the conceded jurisdiction over Sally and Doyle Fritts remained steadfast and became an appropriate subject of a new proceeding under the statute or continuation of the one rightfully commenced. Is this not clear? Well, these parents recognized and proceeded on strength of the conclusion just voiced when they filed (August 18, 1955) their statutory petition for restoration of custody and appealed to circuit from denial thereof.

This brings us to the discovered record fact of filing in probate of said petition of August 18th; denial thereof in probate; due appeal to circuit (by the parents) from denial thereof; motion in circuit (by Mr. and Mrs. Krugh and Mr. and Mrs. Graham) to dismiss appeal on ground that the orders of August 4, 1952, constituted an adjudication in bar of hearing and determination of the petition of August 18th; due submission of said motion to dismiss appeal; filing of the circuit judge's opinion in which he held that the motion to dismiss should be denied, and entry of order in circuit "That the aforesaid petition (of August 18th) be tried on its merits *de novo.** The circuit judge's opinion denying such motion to dismiss is both enlightening and sound. I concur fully with his conclusion. He ruled (quoting from his unvacated and unchallenged opinion filed March 15, 1956):

---

* These record facts are taken from the original and separate Berrien county circuit court file entitled "In the Matter of the Estate of Sally Ann Fritts and Doyle Almo Fritts, Jr." Such file bears Berrien circuit court No B–1400. It now reposes, along with the record first certified here, in our clerk's office.

· "The question of whether or not the probate court had jurisdiction, or whether any of its orders as actually entered were *res judicata* of that question, or of any issue as to the contents and effect of such orders, becomes immaterial as applied to the situation existing now, or at least at the time of the filing of the petition denied in probate court which is the basis of this appeal.

"The petition appears to raise the question of the current status of these children in fact and in law. It should be heard on its merits *de novo* so that this court may determine the status of the children, and if then required, based on the petition as filed determine the issue of custody thereby raised.

. "The motion to dismiss the appeal is denied without costs, and petitioners may prepare an order for signature accordingly."*

All in all it is something more than remarkable to find an appeal pending in circuit, from denial of a statutory petition for supplemental order of disposition, held in abeyance by one judicial hand as the other proceeds by habeas corpus in the same court to question and deny the jurisdiction of the court from which such appeal has been taken. And such is the more unseemly when the same court has just certified, as against the asserted jurisdictional question,

---

* It is suggested that we have no right to consider this additional file and that resort thereto may amount, so far as concerns the present litigant parties, to a denial of due process. To this view of due process—perforce through a small knothole—my answer is short. I am interested more in due process for these children than in misguided process for those who have brought here a curtailed and misleading record; a record which, but for the vigilance of our reporter during his customary check—against such curtailed record—of the foregoing opinions of Justices EDWARDS and SMITH, doubtless would have eliminated from sight of this Court the crucial fact that habeas corpus to settle this issue of custody has indeed and in fact been substituted for a presently pending appeal from denial of a statutory petition for settlement of the same issue. Yes, I propose to provide due process for all, children and contenders alike. It is bad enough to innocently decide a case the wrong way on account of an inadequate and error-causing record but infinitely worse to persist with such error after the decisive record facts are brought here and made known.

that the pending appeal should proceed to trial for the purpose of determining the statutory and real issue all parties, including the involved children, are entitled to have settled. That issue now is whether Mr. and Mrs. Fritts, on 1958 (not 1956) proofs to be taken, are entitled by said petition (for restoration of custody) to a "supplemental order of disposition" in their favor.

*Second: Should habeas corpus be interposed, and substituted for, the pending appeal from probate court?*

The case must be a rarity where any court has permitted parties to utilize habeas corpus as a means to move aside, and thus impede or supersede, regular and pending litigation in which the same issue—presented in the petition for habeas corpus—is due for settlement or overriding adjudication. Our rule, consonant with unanimous authority, is that habeas corpus cannot be substituted for appeal or error. We apply the rule—must apply it—in at least a score of cases each year when petitions for habeas corpus are brought before us to review appealed or appealable jail or prison sentences. Most surely, and in every case save this singular one involving these Berrien county children, we shall continue to apply it *when it is shown that an appeal aimed at the relevant point of adjudication is pending and waiting trial.*

In the recent and duplicating case of *Harmsen v. Fizzell,* 351 Mich 86, 106, Mr. Justice EDWARDS, supported by this writer and 2 other members of the Court, found occasion to consider the general rule to which I refer. After having treated "technical legal problems" brought here in *Harmsen* to test jurisdiction of the same juvenile division, our Brother went on to say:

"More needs, however, to be said, for this case does not involve a criminal proceeding where the right of a person to freedom from restraint is at issue. What is sought here is the use of the writ of. habeas corpus as a substitute for statutory appeal to review long past orders of the probate court or to gain a hearing *de novo* on the issues purportedly adjudicated therein."

I rise to remark that *Harmsen* was a proceeding in habeas corpus, wherein 4 present members of our Court headed by Justice EDWARDS wrote to sustain Berrien county probate (juvenile division) jurisdiction—as against habeas corpus in Berrien circuit—on this sound premise (p 109): "Children are not chattels to which legal title may properly be determined by à technical writ." Yet here our Brother writes to yield juvenile division jurisdiction over—as well as jurisdictional title to—these children, and to do so by issuance of "technical writs." And this he does after having just extolled the superior virtues and advantages of the juvenile division, with its "special jurisdiction, special powers of disposition, and specialized staffing as to children's problems in dependency and delinquency cases." (*Sovereign* v. *Sovereign,* 354 Mich 65, 95, handed down this day). *Quid est?* Or is there something "special" about the jurisdiction of the Berrien juvenile division which requires that its advantages be applied to Ruth and David Harmsen but not to the equally needful Sally and Doyle Fritts?

*Third: The immediate welfare of these children.*

Aside from the above we come to the always-controlling question of present welfare of these children. If, as this Court rightfully declares with reiterant monotony in child custody cases, our prime goal is the greatest good we can do by the child, then Sally and Doyle Fritts should remain in these foster homes pending orderly trial, preferably by jury, of the stat-

utory issue their parents have voluntarily submitted to the juvenile division and brought to the circuit court by appeal. We need not dwell upon the parlous and uncertain life into which these infants—judging from this not-up-to-date record—will be thrust should they be sent by these writs to Kansas. We need not describe the praiseworthy environment of Sally's life since she was enabled—just 6 years ago— to enter and become part of the home of Mr. and Mrs. Graham. Neither must we write details of corresponding and quite undisputed facts disclosing that little Doyle mercifully knows and remembers only the home and care Mr. and Mrs. Krugh have bestowed on him since he was 20 months old. Probably, in all history of this Court, no better record of proper, loving and continuous care of little ones, by foster parents desiring their adoption, has been laid before us. Without assuming to decide the ultimate and properly triable issue—whether the natural parents are entitled to restoration of custody by a supplemental or new order,—our present course on these facts is accurately charted. The children should stay where they are until the mentioned issue is tried to verdict and judgment.

There is a special and separate reason for the determination I espouse. These children are now—and have been for 6 years— subject to the jurisdiction of the Berrien county probate court, juvenile division. Should they be sent away, by these writs to a distant State, effective jurisdiction will have been lost to Michigan and cast upon Kansas. And in Kansas there may be no Krughs or Grahams available to take over when and if the next—from past experience—abandonment of Sally and Doyle takes place.

Recognizing, as I do, judicial authority to send infants beyond our borders and beyond judicial recall (*Lewis* v. *Lewis,* 338 Mich 197, 200), we should in this case announce the important qualification

other courts in their wisdom have seen fit to plainly record. As was said in the annotated case of *Pugh* v. *Pugh,* 133 W Va 501, 509 (56 SE2d 901, 905, 15 ALR2d 424, 430):

"When the award of custody of an infant to a resident of another State, or the removal of the infant to another jurisdiction, will not serve, or is detrimental to, the welfare of the child, such award or such removal will not be permitted (citing numerous authorities). The power of the circuit court to award the custody of the child to the petitioner, who is not a resident of this State, and to permit her to remove the child from its jurisdiction and to the State of California, is clear beyond question. It should not exercise that power, however, unless the award of custody to a person who is not a resident of this State and the permission to take the child out of this State promote the welfare of the child."

The subject will be found thoroughly briefed in the above-cited annotation, starting on page 432, under the heading "Nonresidence as affecting one's right to custody of child." The entire annotation (15 ALR2d 432) may be summarized as a boresightedly accurate declaration of power and duty to release a child from the jurisdiction—to that of another State—when and only when it is found that the welfare of the child will best be promoted by an order for such release. Here there is no such finding, below or in our majority opinion, and none could be fashioned from this complete record without resort to transparent distortion.* In these circumstances (and entirely apart from other considerations pre-

---

* Under date of October 19, 1955 (the petition for order of restoration having been recently filed), the Berrien county juvenile officer filed his detailed report with recommendation. It concludes, and I believe it to be the right fact-conclusion we should reach, as follows:

"It would be a perversion of justice to tear these children away from their present homes and place them back in a home where there is continual strife and insecurity."

sented in this opinion) I would resolve the doubt—
there is none in my mind—in favor of present reten-
tion, of Berrien county's statutory probate jurisdic-
tion, by and through dismissal of these writs.   As
was said in *Butler* v. *Perry*, 210 Md 332, 342 (123
A2d, 453, 458) :

"We do not suggest for an instant that if the best
interests of a child required it that the child should
not be sent out of the State.  *  *  *  We merely say
that in a close case, such as the case before us, one
consideration is that the court may exercise much
more effective control when custody is kept in the
State."

The supreme court of Minnesota had recent occa-
sion to consider the application of a mother, made
under circumstances much like those shown here, for
custody of her young son and for leave to take him
from Minnesota to her place of residence in Ohio
(*State, ex rel. Jaroszewski,* v. *Prestidge,* 249 Minn
80 [81 NW2d 705]).   The court's reasoning to denial
of that application is, in my view, decisively good
for the case at bar.   The court said (p 90) :

"It is always difficult for a court to decide that a
natural mother shall be deprived of the custody of
her child.   However, under the facts and circum-
stances here, we feel that it will not be for the best
interests of the child at his tender age to take him
away from the home and environment, church and
school connection, which he has known up to now, and
place him in the custody of respondent.

"The record shows that he has been raised and
cared for by appellants since he was a few months
old; that they still desire to have him live with them;
and that the boy seems happy and contented with his
present home and environment.   We believe that a
serious emotional upset could result if a transfer of
custody were made at this time.   One of the consid-
erations in our decision is the fact that there has been

no satisfactory showing of a stable home or proper environment if custody were given to the respondent, nor has there been any convincing showing that her type of work and life have changed sufficiently so that the child should now be placed in her custody."

## *Summary*

This case—one of review and approval of issuance of "technical writs" divesting the juvenile division of jurisdiction over 2 children whose right to exercise of such jurisdiction stands unquestioned by word or reason—goes into our reports crying in vain for answer, by our quadriad majority, of 2 stark questions: Was the juvenile division possessed of no jurisdiction, under said chapter 12A, to hear and determine the yet pending and ready-to-be-tried statutory petition by the natural parents for restoration of custody? When and by what act or reasoning has the juvenile division lost its acquired jurisdiction over Sally and Doyle Fritts; the jurisdiction which concededly was vested in and with such division when the gavel announced the opening of court on August 4, 1952?

From such want of answer sprouts our incredible mistake in this case; that of release of these writs when no one here knows—any more than do the probate and circuit judges below—what today's fact-picture in Kansas (distinguished from that of more than 2 years ago) is or may be. Writs of habeas corpus either issue, or they do not. Let us hope that these errantly signed writs are arrested—short of the State line—before it is too late.

I vote to reverse with remand for dismissal of the writs and with instruction to proceed toward prompt trial of the pending appeal from probate court. Further, I would recommend to the circuit court that consideration be given to its discretion to order that such appeal be transferred to the jury

calendar (See section 3 of Court Rule No 33 [1945]·
and author's comment under section 2 of Court Rule
No 74 [1945])* and to provide by order for the ap-
pointment of a guardian and vigorous trial counsel
for the real parties in interest, Sally and Doyle
Fritts.

Smith and Voelker, JJ., concurred with Black, J.

Kavanagh, J., took no part in the decision of this
case.

* Honigman, Michigan Court Rules Annotated, p 704.