IN THE MATTER OF MOORE

Docket No. 70343. Submitted January 4, 1984, at Grand Rapids.—
Decided May 14, 1984.

Michelle L. Moore, mother of William Lee Moore, Lee Edward
Moore, and Shawndryka Moore, sought in March, 1981, to have
the children placed in temporary foster care, allegedly because
she was being evicted from her apartment when she was
unable to pay the rent because one welfare check and the
proceeds of another welfare check were stolen. Following a
preliminary hearing, a probate court referee placed the chil-
dren in foster care pending a hearing. The Kent County De-
partment of Social Services filed a petition with Kent Probate
Court, Juvenile Division, alleging that the parents of the chil-
dren "refuse or neglect to provide proper and necessary support
and care" and requested that the probate court take jurisdic-
tion over the children. Both Michelle Moore, as mother of the
children, and William Manning, as father of the children,
entered into "parent-agency agreements" with the D. A. Blod-
gett Homes for Children. Ms. Moore by that agreement agreed
to a treatment plan, promising to find suitable housing, to
apply for and meet the requirements for financial assistance or
seek employment, to attend school or job training classes, to
counsel biweekly with a caseworker, to attend and invest in
parenting classes, and to visit her children biweekly. Thereaf-
ter, following a hearing in Kent Probate Court, Juvenile Divi-
sion, Randall J. Hekman, J., at which Ms. Moore admitted the
allegations in the petition, the children were made wards of the
probate court and were referred to the Kent County Depart-

REFERENCES FOR POINTS IN HEADNOTES

[1-7] 59 Am Jur 2d, Parent and Child §§ 5, 39, 40.
Validity of state statute providing for termination of parental
rights. 22 ALR4th 774.
Sexual abuse of child by parent as ground for termination of
parent's right to child. 58 ALR3d 1074.
Physical abuse of child by parent as ground for termination of
parent's right to child. 53 ALR3d 605.
[3-5, 8] 42 Am Jur 2d, Infants §§ 16, 55.
[7] 59 Am Jur 2d, Parent and Child § 90.

ment of Social Services for placement and supervision in a licensed foster home. In July, 1981, Ms. Moore pled guilty to soliciting for prostitution and was fined and placed on probation for one year. In October, 1981, Ms. Moore was found guilty of probation violation and was jailed from October 25, 1981, through December 11, 1981. In August, 1981, the Kent County Department of Social Services filed a petition seeking the termination of the parental rights of Michelle Moore and William Manning, alleging that they were unable to provide a fit home for William, Lee, and Shawndryka Moore by reason of neglect. With respect to Ms. Moore the petition alleged that she had not completed the goals of her treatment plan in that she failed to obtain suitable housing, failed to attend parenting classes, failed to maintain regular contact with her caseworker, failed to maintain visitation with her children, failed to comply with her probation requirements, failed to obtain employment or other source of income, and failed to attend school or job training classes. Following a hearing held in August, 1982, Judge Hekman found the evidence "pretty much evenly balanced" and ordered a continuance for four months. In February, 1983, following another hearing, Judge Hekman found that the father, William Manning, had not abided by the provisions of the parent-agency agreement and had taken little interest in the children. As to the mother, Michelle Moore, Judge Hekman found that she had moved repeatedly, that she had reasonably complied with a number of the provisions of the parent-agency agreement she had signed, that she was emotionally weak, that she had an unsavory past, had been convicted of prostitution and had spent time in jail, that she had emotional problems, that the children had lived in foster care for 22 months and needed a permanent home as soon as possible, and that she was adequately caring for her new child, born while the other children were in foster care, but that she could not reasonably meet the needs of the baby plus the other children. Judge Hekman concluded that Ms. Moore had neglected the children in the past, that she neglected them while they were in foster care by not availing herself of counseling and the parenting classes, and that it was likely that she would neglect the children if they were returned to her. Finding long-term neglect in the past and a serious threat to the future welfare of the children if parental rights were not terminated, Judge Hekman terminated the rights of both parents. Michelle Moore appealed. *Held:*

1. Parental rights may be terminated only upon clear and convincing evidence that termination of those rights is war-

ranted. Termination on the basis of neglect is proper upon the presentation of real evidence of long-term neglect or serious threats to the future welfare of the child.

2. None of the factors relied upon by the probate court to support its determination to terminate Michelle Moore's parental rights in her three older children are sufficient alone or together to warrant termination of those rights, there being no showing of neglect.

3. While a long-term residence is desirable, repeated changes in one's residence cannot be considered to be the neglect necessary to warrant termination of parental rights.

4. The failure to attend counseling sessions or parenting classes does not constitute neglect where, as here, the record fails to establish by clear and convincing evidence that such counseling and classes are needed to correct neglectful behavior.

5. The record fails to support the finding of emotional weakness or problems which would establish either past neglect or future threat to the welfare of the children.

6. The fact of arrest and incarceration for prostitution does not establish the parental neglect necessary to terminate parental rights.

7. The probate court improperly treated the long period of foster care as a reason for terminating the mother's parental rights in her children since that long period of foster care was largely a result of the court's own continuing order which kept the children as wards of the court in foster care.

8. The fact that the mother sought the aid of a government agency in placing her children in temporary foster care when confronted with the prospect of eviction from her apartment is not evidence of neglect but, instead, is evidence of her concern.

Reversed and remanded.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

Parental rights may not be terminated except upon proof by clear and convincing evidence that the termination of those rights is warranted.

2. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PARENTAL RIGHTS.

Termination of parental rights on the basis of neglect is proper only upon the presentation of real evidence of long-term neglect or serious threats to the future welfare of the child (MCL 712A.19a[e]; MSA 27.3178[598.19a][e]).

3. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PAREN-
   TAL RIGHTS — CHANGE OF RESIDENCES.

   Repeated changes of residences, while not as desirable as provid-
   ing a long-term residence for one's children, is not properly
   treated as proof that a parent is neglecting his or her child for
   the purpose of determining whether to terminate parental
   rights.

4. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PAREN-
   TAL RIGHTS — PARENTING CLASSES.

   The failure of a parent to attend parenting classes does not
   establish the neglect necessary to warrant termination of pa-
   rental rights over his or her child where there is no clear and
   convincing evidence that such classes were actually needed to
   improve neglectful behavior by the parent.

5. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PAREN-
   TAL RIGHTS — EMOTIONAL PROBLEMS.

   The fact that a parent might have emotional problems or weak-
   nesses does not, by itself, establish real evidence of long-term
   neglect of a parent for his or her child nor does it establish real
   evidence of serious threat to the future welfare of the child
   such as will warrant termination of parental rights over the
   child where there is no evidence that the parent neglected the
   emotional needs of the child.

6. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PAREN-
   TAL RIGHTS — CRIMINAL CONVICTIONS.

   Proof of a conviction for soliciting for prostitution does not
   establish the existence of the parental neglect necessary to
   warrant termination of a mother's right to custody of her child.

7. PARENT AND CHILD — CHILD NEGLECT — TERMINATION OF PAREN-
   TAL RIGHTS — FOSTER HOME CARE.

   The fact that children have been living in a foster home for a
   period of time does not establish the parental neglect necessary
   to warrant termination of parental rights over his or her child
   where the extended foster care and lack of a permanent home
   with the parent is largely the result of a continuing order of
   the probate court keeping the children in a foster home envi-
   ronment as temporary wards of the court.

8. PARENT AND CHILD — CHILD NEGLECT — FOSTER HOME CARE.

   The fact that a parent seeks to have his or her child temporarily
   placed in foster care by a government agency because the
   parent is unable to provide necessary care and shelter at that
   time is not evidence of parental neglect; indeed, seeking tempo-

rary foster care of one's child where circumstances render the parent unable to provide necessary care and shelter actually tends to show the absence of neglect.

*David H. Sawyer,* Prosecuting Attorney, and *David R. Gersch,* Assistant Prosecuting Attorney, for Kent County Department of Social Services.

*Farley & Chase* (by *William R. Farley),* for Michelle L. Moore.

Before: R. B. BURNS, P.J., and V. J. BRENNAN and J. T. KALLMAN,* JJ.

J. T. KALLMAN, J. Michelle L. Moore (hereinafter respondent) appeals as of right from an order entered in the Kent County Probate Court which terminated her parental rights to her minor children, William, Lee, and Shawndryka. Respondent continues to have custody of a baby who was born after the events leading to the termination of her parental rights in respect to William, Lee, and Shawndryka.

In March, 1981, respondent sought temporary foster care placement for her children. Respondent explained that she was on welfare and that the rent money provided her by the Michigan Department of Social Services had been stolen. Respondent stated that one welfare check had been stolen from her mailbox and that she had cashed a second check, but the money was stolen from her house. According to respondent, the Michigan Department of Social Services was unwilling to provide any further funds for the rent, and her landlord was threatening to place her belongings on the street.

The Kent County Department of Social Services

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

(hereinafter DSS) filed a petition with the Kent County Probate Court, seeking jurisdiction of respondent's children pursuant to MCL 712A.2(b)(1); MSA 27.3178(598.2)(b)(1). The petition specifically alleged that respondent neglected or refused to provide proper and necessary support for her children, and jurisdiction was assumed on the basis of this petition.[1]

On April 20, 1981, respondent entered into a "parent-agency agreement" with the D. A. Blodgett Homes for Children (hereinafter Blodgett). Respondent agreed to: (1) find and maintain suitable housing within three months, (2) apply for and meet requirements for financial assistance or seek employment, (3) attend school or job training classes, (4) counsel biweekly with a caseworker, (5) consistently attend and invest in parenting classes, (6) visit her children biweekly, and (7) utilize public transportation and apply for a driver's license.

Respondent pled guilty on July 24, 1981, to a charge of soliciting for prostitution and was fined and sentenced to probation for a period of one year. Respondent was later convicted of probation violation and was sentenced to a year's extension of probation and to 20 days in jail for contempt of

[1] Respondent admitted the allegations in this petition, although they are patently inconsistent with a document entitled "Kent County Juvenile Court Neglect Fact Sheet" which appears as part of the record. This document specifically indicates that respondent was being evicted from her home and notes that respondent "reports that at the present time she is unable to provide her children with the care and stable environment she feels they require". On its face, rather than presenting a scenario in which a parent refuses to support her children, this matter seemingly falls within the ambit of MCL 712A.2(b)(2); MSA 27.3178(598.2)(b)(2), allowing jurisdiction to be assumed over the children of an unmarried mother "without adequate provision for care and support". However, because respondent admitted the allegations appearing in the petition seeking jurisdiction, we will not inquire into the underlying validity of the facts contained in that petition.

court. Respondent was jailed from October 25 through December 11, 1981. However, her probation officer, Janice Hammerlind, was satisfied that respondent did not thereafter violate the conditions of her probation.[2]

The DSS filed a petition on August 30, 1982, alleging that the Moore children were within the provisions of MCL 712A.19a(e); MSA 27.3178(598.19a)(e), in that the parents were unable to provide a fit home by reason of neglect. Specifically, the petition alleged that respondent had not completed the goals of her treatment plan in that she failed to obtain suitable housing, failed to attend parenting classes, failed to maintain regular contact with her caseworker, failed to maintain visitation with her children, failed to comply with her probation requirements, failed to obtain employment or other source of income, and failed to attend school or job training classes. A hearing on the petition was commenced on August 30, 1982. At the conclusion of the hearing, the court found the evidence "pretty much evenly balanced" and ordered a continuance for four months.

On September 24, 1982, respondent entered into a new "parent-agency agreement" with Blodgett whereby she agreed to: (1) find and maintain suitable housing within the next three months, (2) apply for and meet requirements for financial assistance or seek employment, (3) counsel with her caseworker biweekly, (4) consistently attend and invest in parenting classes weekly, and (5) visit her children biweekly.

---

[2] Of course, it is always possible that respondent's subsequent violations were merely undetected. Hammerlind indicated, however, that the area of Division Street, in which prostitution is most common in Grand Rapids, is regularly patrolled and that the police officers in this part of the city routinely report probationers they catch in the area.

The neglect hearing was continued on February 16, 1983. In its opinion, the probate court found that respondent could not consistently avoid neglecting the important emotional needs of her children while caring for the new baby. The court concluded that respondent was without "the necessary responsibility and emotional energy to attend to the children's ongoing emotional and ultimately physical needs". The court concluded that respondent's failure to avail herself of counseling and parenting classes constituted neglect. The probate court found "pursuant to § 19a(e) of the Juvenile Code [MCL 712A.19a(e); MSA 27.3178(598.19a)(e)] and by clear and convincing evidence that the parents are unable to provide a fit home for their children by reason of neglect which the court finds is likely to continue into the future".

The testimony taken at the August 30, 1982, and February 16, 1983, hearings will be detailed below.

Parental rights may not be terminated except upon proof by clear and convincing evidence that the termination is warranted. *In the Matter of LaFlure,* 48 Mich App 377, 386; 210 NW2d 482 (1973), *lv den* 390 Mich 814 (1973). The statutory provision under which respondent's parental rights were terminated is MCL 712A.19a(e); MSA 27.3178(598.19a)(e), which provides for termination of those rights upon a finding by the court that: "[T]he parent or guardian is unable to provide a fit home for the child by reason of neglect." The Michigan Supreme Court has held that to justify termination of parental rights based on neglect "real evidence of long-time neglect or serious threats to the future welfare of the child" must be shown. *Fritts v Krugh,* 354 Mich 97, 116; 92 NW2d 604 (1958). This Court has applied both a *de novo* and a clearly erroneous standard of appellate re-

view in termination cases. *In the Matter of Bailey,*
125 Mich App 522, 527; 336 NW2d 499 (1983).
While we have no doubt that respondent is not an
ideal parent,[3] we are equally convinced that, under
either of the standards of appellate review set
forth in *Bailey,* termination of respondent's paren-
tal rights was unwarranted. The simple fact is
that this record contains no real evidence of ne-
glect by respondent but, rather, shows only that a
poorly educated woman without substantial job
skills who has largely made her own way in the
world since the age of 13 has had problems obtain-
ing housing for her children. The ultimate moral
of this case is that a mother without the current
means of supporting her children should do any-
thing but attempt to get aid from the Department
of Social Services if she wants to keep her chil-
dren.

The record is wholly lacking in evidence that, at
the time respondent initiated involvement with
the DSS, her children were neglected or abused.
Indeed, Tom Nelson, a caseworker with Blodgett,
who supervised respondent's case until July, 1982,
testified at the August hearing that respondent's
children were in reasonably good shape, both emo-
tionally and physically, at the time respondent
sought help from the DSS. Nelson admitted that
respondent had shown herself to be a capable
mother. Nelson further acknowledged that the
interaction between respondent and her children
was excellent and that there was definite bonding
between respondent and the oldest child, William
Lee, who suffers from multiple handicaps. Al-
though respondent had moved frequently, Nelson
described her housing arrangement at the time of
the hearing as adequate.

[3] "He that is without sin among you, let him first cast a stone at
her." *The Holy Bible* (King James version), John 8:7.

Despite these positive attributes of respondent and the positive aspects of her relationship with her children, Nelson concluded that her parental rights should be terminated because she allegedly had missed 6 of 13 scheduled visits with her children and had not engaged in counseling or attended the parenting classes which were part of her agreement with Blodgett.[4] When the court asked Nelson why it should not simply return the children to respondent's care given his admission that respondent had previously provided her children with good care, Nelson responded vaguely about respondent's "lifestyle" and expressed concern that respondent would not be able to meet the needs of her children due to her own youth.

Respondent's probation officer, Janice Hammerlind, testified that, since the probation violation in September, 1981, she was satisfied that respondent had complied with her probation.[5] Hammerlind stated that respondent had been attending job training classes offered through South Kent Community College and that she had been informed by respondent's instructor that there had been no

[4] Respondent testified that she had probably missed only two scheduled visits with her children and that the failures to make those visits were Nelson's fault. Respondent indicated that on both occasions she had appeared for the visits. On one occasion, a Blodgett supervisor told her that the foster parents knew nothing about a visit. When she later asked Nelson about the problem, he indicated that he had forgotten about the visit. On the other occasion, Nelson told her that the children were not ready for the visit and that she would have to see them another time.

It is clear from the record that there was some animosity between respondent and Nelson. That the pair did not get along was confirmed by the testimony of respondent's probation officer.

[5] Respondent violated her probation by being seen on Division Street at 10:05 p.m. one evening. She was sighted on Division one time after she was found guilty of probation violation. However, the officer who spotted her was unsure if respondent was there to solicit and, consequently, did not arrest her. Respondent testified that she was merely going to the Acapulco Restaurant with a woman friend for something to eat.

problems with attendance. Hammerlind testified that respondent was very positive about the children and always expressed love and concern for them. She believed that respondent's housing arrangements were suitable. Hammerlind indicated that, while she did not feel qualified to comment on respondent's progress in respect to the juvenile court, respondent had made positive substantial changes over the last eight months with respect to the district court and the probation order.

Charles Johnson, a caseworker with Blodgett who was assigned to replace Tom Nelson on the Moore case, also testified at the August 30, 1982, hearing. At that time, Johnson had been involved with the case for about four weeks. Johnson observed respondent interact with the children on two occasions. Respondent showed a great deal of affection towards the children. Respondent failed, however, to meet him for a scheduled counseling appointment. She later told Johnson that she had injured her hand and had to seek medical attention. This was confirmed by respondent's sister, Queen Moore. Based on his limited observation of the case, Johnson recommended that respondent's parental rights not be terminated.

At the time of the February hearing, however, Johnson recommended that respondent's parental rights be terminated. Johnson's recommendation was made despite the fact that respondent had visited the children regularly and had attended 7 of 10 counseling appointments scheduled with him. Johnson further testified that he had no doubts that respondent's displays of love and affection for her children were sincere, that respondent's new residence was satisfactory for herself and her four children, and that respondent was providing adequate care for her new child.

Despite the foregoing testimony, Johnson rather incongruously contended that respondent's lack of parenting skills would cause her to neglect her children, which neglect he later stated would take the form of not meeting the "emotional needs" of the children. At the same time, however, when asked outright whether respondent would be able to care for her children over the long haul without neglecting them, Johnson responded: "I can't answer that. I don't know". Johnson also allowed that he believed that respondent "could properly care for this infant child that she has".

Johnson was particularly concerned about respondent's ability to care for William, the handicapped child. He allowed that it would be easier for respondent to care for the two younger children if she was not also required to care for William. Nonetheless, he could not recommend returning the younger children because he did not believe William, Lee, and Shawndryka should be separated.[6]

Johnson also testified that respondent had only unqualifiedly failed to meet one goal of her "agency-parent" agreement with Blodgett, *i.e.,* she failed to attend parenting classes. In addition, respondent had "not totally" fulfilled the counseling provisions of this agreement.

The probate court made various enumerated findings which it concluded constituted clear and convincing evidence, justifying termination. These findings and our views on each will be summarized below.

---

[6] Although William's handicaps were such that he required more attention than young infants, there is still no demonstrable evidence that respondent neglected William's needs. In any case, even if such evidence existed, respondent's failure to care for William would not justify the termination of respondent's parental rights in respect to Lee and Shawndryka simply because it would be nice to keep all three children together.

1. *Respondent moved repeatedly.* While it would be desirable to maintain a long-term residence, the failure of a poor woman to do so hardly is proof that she will neglect her children. The testimony concerning respondent's residence as of the last hearing was that it was adequate for her and her children.

2. *Respondent did not reasonably comply with the treatment plan.* The court noted that respondent had been informed of the importance of the parenting classes, counseling, and visitation with the children. It further found that "while she has complied with some of these requirements, she has substantially failed to complete all of them satisfactorily".

It is undeniable that respondent did not attend the parenting classes. However, this record wholly lacks evidence that respondent was an inadequate parent. All of the testimony shows that when the children were voluntarily brought to the DSS, they appeared to be well cared for. Johnson testified that respondent's new baby was adequately cared for. Everybody agreed that respondent showed genuine love and affection for her children. In the absence of clear and convincing evidence that the parenting classes were actually needed to improve neglectful behavior, which is not the case here, the failure to attend such classes does not establish neglect.

The court's findings concerning respondent's compliance with the counseling and visitation aspects of the treatment plan obviously focus far more on respondent's behavior prior to the August hearing than her behavior subsequent to the August hearing. After the August hearing, the court found the evidence essentially "equal" and continued the case. Thereafter, respondent apparently

made each scheduled visit with her children and substantially improved her counseling record. Despite these dramatic improvements, the court nonetheless felt that, after the February hearing, neglect had been proven by clear and convincing evidence. It is difficult to understand this conclusion, given that the court found insufficient evidence of neglect to terminate respondent's rights on a record less favorable to respondent in August.

3. *Respondent is emotionally weak.* We do not necessarily know what the probate court meant by describing respondent as "emotionally weak". Nonetheless, the existence of emotional problems or weaknesses, by themselves, simply do not establish "real evidence of long-time neglect or serious threats to the future welfare of the child". *Fritts, supra.* This record contains no evidence that respondent neglected the emotional needs of her children while they were in her custody.

4. *Respondent has an unsavory past, has been convicted of prostitution, and has spent time in jail.* Apart from the fact that respondent's probation officer is satisfied that respondent has made positive changes in regard to her attitude toward the law, a conviction for soliciting for prostitution simply does not establish neglect as defined by *Fritts.* Criminal involvement far more serious than the misdemeanor for which respondent was convicted has been held insufficient to justify termination of parental rights. See, *e.g., In the Matter of Curry,* 113 Mich App 821; 318 NW2d 567 (1982) (father serving a life sentence as an habitual criminal; mother incarcerated on a charge of delivery of cocaine, allegedly committed while on "inmate status" from a previous larceny in a building conviction).

5. *Respondent's documented emotional problems.*

Introduced at the February hearing was a report of psychologist Thomas Gunnings' evaluation of respondent's mental state. Based upon the "Forty-Eight Item Counseling Evaluation Test Revised (ICET)," the "Draw-A-Person (DAP)" test, the "Incomplete Sentence Blank Adult Form (Rotter)", and one interview of an unspecified duration Gunnings concluded that, despite respondent's best intentions, she would be unable to avoid neglecting her children's emotional needs when under stress. Gunnings was not called as a witness at either hearing.

We believe that termination cannot be premised on Gunnings' views given his very limited contact with respondent and the fact that he was not even subject to cross-examination. Gunnings' prediction as to how respondent would respond to her children's needs plus demonstrable real evidence of past serious neglect could well be sufficient to terminate respondent's parental rights. On this record, however, as noted above, there is an utter lack of any real evidence of neglect, long-term or otherwise. The time has not yet come that a prediction of future emotional neglect made by a psychologist based upon one interview with a parent can constitute the basis for terminating rights.

6. *All three children have lived together in foster care for 22 months and need a permanent home as soon as possible.* We do not quarrel with this finding, but it simply does not establish long-term neglect. The children have been in foster care for 22 months and deprived of a permanent home with their mother largely because the court has not seen fit to return the children to respondent.

7. *Respondent is adequately caring for her new child, but could not reasonably meet the needs of*

*the baby and the other three children.* The prediction that respondent could not care for her four children is simply not supported by the history of respondent's interactions with her children. There is no evidence that respondent was not adequately caring for William, Lee, and Shawndryka at the time she sought aid from the DSS because of the eviction. Indeed, the evidence of record shows that respondent's children were in reasonably good shape, both physically and emotionally, at the time she voluntarily gave them up to the DSS for what she believed was a temporary placement. The court explicitly found that respondent is providing adequate care for her new child. There is simply no basis in the history of respondent's interactions with her children upon which a finding of neglect inside the meaning of *Fritts* can be premised.

Apart from its enumerated findings, the probate court also made much of the fact that respondent admitted at the time she voluntarily agreed to make her children temporary wards that she was unable to care for them. This constitutes the crowning irony of this case, namely, that the probate court apparently punishes respondent for responsibly seeking shelter for her children at a time when she was in the process of being evicted and, thus, was unable to provide them with adequate housing. Rather than constituting evidence of neglect, we believe respondent's decision to seek aid for her children from the DSS actually tends to show the absence of neglect. Numerous decisions have held that a parent unable to provide for a child does not act neglectfully where she arranges with a relative to take care of that child. See, *e.g., In the Matter of Curry,* 113 Mich App 81; 318 NW2d 567 (1982); *In the Matter of Carlene*

*Ward,* 104 Mich App 354; 304 NW2d 844 (1981). Similarly, we do not believe that a parent who seeks a temporary placement of her children through a county department of social services acts neglectfully.

In conclusion, the probate court's order terminating respondent's parental rights is not supported by clear and convincing evidence that termination was warranted. Petitioner failed to present clear and convincing evidence that respondent was unable to provide a fit home for her children by reason of neglect. At the conclusion of the August 30, 1982, hearing, the probate court found the evidence evenly balanced. Following the August 30, 1982, hearing, respondent had established a residence described by her caseworker as adequate for her children. Respondent was adequately caring for her newborn baby. Respondent had attended scheduled visitations with her children and there appeared to be a genuine affectionate relationship between them. Respondent had significantly bettered her attendance at the scheduled counseling sessions with her Blodgett caseworker and had not involved herself in any further criminal activities. The probate court's decision to terminate respondent's parental rights seems to be based primarily on her failure to attend parenting classes. This is not an adequate reason for termination, either by itself or when considered with all the evidence of record.

Reversed and remanded.