## IN THE MATTER OF TEDDER

Docket No. 81518. Submitted December 11, 1985, at Lansing.—Decided April 9, 1986.

The Michigan Department of Social Services petitioned the Ingham Probate Court to terminate the parental rights of respondent, Joyce Tedder, to her daughter, Helen Tedder, a minor, on the basis of neglect. The probate court, Gerald J. Supina, J., entered an order terminating respondent's parental rights, after concluding that respondent is unable to provide a fit home for Helen because of long-standing neglect and that respondent is a serious threat to the long-term future and emotional well-being of her daughter, Helen. Respondent appealed. *Held:*

1. Termination of parental rights by reason of neglect entails a showing of culpability on the part of the parent through either *intentional or negligent disregard of the child's needs*. In this case, while the probate court found that Helen had been emotionally damaged because of respondent's characterological disorder, it did not find that the damage was done intentionally. The involuntary nature of respondent's disorder combined with her love for her child and her willingness to undergo psychotherapy precluded a conclusion of culpable neglect. Therefore, the probate court erred in terminating respondent's parental rights.

2. The probate court erred in ordering respondent's treating psychologist to testify in abrogation of the psychologist-patient privilege. Neither MCL 722.631, a section of the Child Protection Law which abrogates the privilege where a report of suspected child abuse is required under the act or where the communications subject to the privilege are offered as evidence of neglect or abuse in a child protective proceeding, nor case law supported the probate court's action. However, the error

REFERENCES

Am Jur 2d, Appeal and Error §§ 134 *et seq.*

Am Jur 2d, Parent and Child §§ 8 *et seq.*

Physical abuse of child by parent as ground for termination of parent's right to child. 53 ALR3d 605.

See also the annotations in the ALR3d/4th Quick Index under Appeal and Error.

was harmless beyond a reasonable doubt, since the psychologist's testimony was not necessary or material to the petitioner's proof of neglect but was cumulative.

3. The probate court erred in ruling that the Child Protection Law abrogated the confidentiality of Department of Social Services records concerning respondent and in ordering the testimony of Department of Social Services workers regarding the contents of the records. The records did not pertain to any evidence of child abuse or neglect and, therefore, did not fall within the ambit of the Child Protection Law. However, the error did not prejudice respondent and did not require reversal, since the testimony was limited to respondent's series of address changes. Such information could have been secured from the department by anyone upon proper request and evidence of the address changes had been established through the testimony of other witnesses.

Reversed.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — APPEAL.

The findings of a probate court in a proceeding to terminate parental rights are reviewed on appeal under the clearly erroneous standard.

2. APPEAL — FINDINGS OF FACT.

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

3. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

The standard to be applied by a probate court in proceedings to terminate parental rights pursuant to the juvenile code is whether the parent has been shown by clear and convincing evidence to be unfit and unable to become fit; after that standard has been met, the probate court should consider the best interests of the child in exercising its discretionary power (MCL 712A.19a; MSA 27.3178[598.19a]).

4. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

Termination of parental rights on the basis of neglect is proper only upon the presentation of real evidence of long-term neglect or serious threats to the future welfare of the child (MCL 712A.19a[e]; MSA 27.3178[598.19a][e]).

5. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

Termination of parental rights by reason of neglect entails a

showing of culpability on the part of the parent through either intentional or negligent disregard of the child's needs; parental rights should not be terminated on the basis of neglect where the needs of the child are not fully met because of a parent's honest mistakes or a parent's characterological or emotional disorder, where there has been no culpable disregard of duty by the parent (MCL 712A.19a[e]; MSA 27.3178[598.19a][e]).

6. PARENT AND CHILD — CHILD ABUSE — CHILD PROTECTION LAW — PRIVILEGED COMMUNICATIONS.

The section of the Child Protection Law which provides that any legally recognized privileged communication except that between attorney and client is abrogated only applies where a report of suspected child abuse is required under the act or where the communications subject to a privilege are offered as evidence of neglect or abuse in a child protective proceeding (MCL 722.631; MSA 25.248[11]).

*Peter D. Houk*, Prosecuting Attorney, *Robert B. Ebersole*, Chief Appellate Attorney, *Susan L. Le Duc*, Assistant Prosecuting Attorney, for petitioner.

*Kenneth G. DeBoer*, Guardian Ad Litem.

*Scodeller, Wilson, DeLuca & Vogel* (by *Henry W. Schober, Jr.*), for respondent.

Before: D. E. HOLBROOK, JR., P.J., and T. M. BURNS and HOOD, JJ.

PER CURIAM. Appellant appeals as of right from an order of the probate court terminating her parental rights to her daughter, Helen Tedder.[1]

Helen Tedder was born on November 26, 1979, seven weeks premature. Until Helen's discharge from the hospital on December 17, 1979, it is undisputed that appellant spent a great deal of time with Helen and took an active interest in Helen's care. Appellant's care of Helen, however,

[1] The identity of the child's father and his rights are not at issue in this case.

was often inappropriate and inconsistent. Specifically, appellant would interrupt Helen's feedings before they were completed and she seemed more preoccupied with other concerns than with feeding Helen.

Appellant also refused to take Helen home upon Helen's discharge from the hospital, claiming that her apartment was unsuitable for the child and that she lacked certain items necessary for Helen's care such as a vaporizer, telephone and car seat. According to the hospital staff, Helen did not require the claimed necessities for medical reasons. Moreover, a visit by a social worker to appellant's apartment revealed that the apartment was adequate for the child's needs at the time. Eventually, appellant agreed to take Helen home but she also protested that if any harm came to Helen it would be the hospital's responsibility because the hospital was not meeting her needs.

These circumstances led the Department of Social Services to petition on December 26, 1979, for temporary custody of Helen pursuant to MCL 712A.2(b)(1); MSA 27.3178(598.2)(b)(1). Helen was thereafter placed in foster care where she remained until April, 1981, when, at the age of 15 months, she was returned to her mother. During the time Helen was in foster care, appellant satisfactorily complied with various court orders. She obtained adequate housing, visited Helen regularly, and attended parenting classes and psychotherapy sessions. Appellant also appealed from the order placing Helen in foster care, but the order was affirmed by the Ingham Circuit Court.

Joanne Reen was the first social worker assigned to the Tedder case and had regular contact with the Tedders beginning in January, 1982. Reen testified that appellant moved several different times and on home visits Reen often found the

Tedder residence messy and cluttered with papers and boxes. On various occasions, appellant told Reen that she would not clean up the residence because it was not her responsibility, or that she would not unpack her belongings because she was dissatisfied with the landlord, housing and neighbors, and was going to move again.

Reen testified that, at times, she and appellant worked well together and at other times they were at odds. When appellant disagreed with Reen, appellant would become verbally aggressive, antagonistic and project blame for her difficulties onto others. During the first year of their relationship, appellant seemed to improve her parenting skills. Reen believed that the therapy in which, as of May, 1981, appellant was voluntarily involved was of great benefit to her.

The relationship between Reen and appellant ultimately broke down by December, 1983. The breakdown occurred over disagreements concerning Helen's inconsistent attendance at day care and generally because of Joyce's personality traits. Day care for Helen had been recommended by the court at Reen's suggestion. Appellant blamed Helen's inconsistent attendance on the day care's bus driver who allegedly never picked up Helen on time. Appellant generally expressed dissatisfaction with the day care's management and ultimately filed a complaint against the day care. Helen was re-enrolled at another day care but by December, 1983, appellant had pulled Helen out of it because "it was a pool of constant infection".

Reen testified that there has never been any allegations that Helen was not adequately clothed, fed or given medical attention. Helen also had a surprising number of toys to play with considering that appellant was on welfare.

While Reen knew of no instances of physical or

intentional emotional abuse, she described examples of how appellant emotionally abused Helen unintentionally. Reen referred to sporadic physical fights between appellant and a neighbor that Helen witnessed. She also referred to an incident related to her by appellant's former landlord wherein appellant allegedly told Helen to lie about his stepping on Helen's feet. Reen also testified about another incident concerning a spanking which appellant gave Helen when Helen vomited on a library book. At the time, according to Reen, appellant thought Helen had vomited to get her attention because Helen had done that in the past. Appellant regretted spanking her, when she later realized Helen really had been physically ill.

Reen testified that she was compelled to file for a "change of program" in January, 1984, upon concluding that appellant's home was no longer acceptable for Helen. At the time, however, she testified that she did not see a need to file for permanent wardship because the interaction between Helen and appellant was generally appropriate.

Pursuant to Reen's petition for a change of program, Helen was removed from appellant's care in January, 1984, and Kristen Godby from the DSS was assigned to the case. Godby monitored the visits between mother and child and perceived that their interaction was not a negative one. Her testimony did not establish anything significantly unusual about the relationship between mother and child.

Dr. Dale Ann Singer, Helen's pediatrician since birth, also testified during the hearing. Dr. Singer testified that she was concerned that Helen was mimicking appellant's mannerisms and behavior such as scuffing her feet, appearing unkempt, and becoming uncommunicative and inactive in the

office. She testified that Helen also gradually became obese.

Dr. Singer testified that appellant's inconsistency in seeking medical attention for Helen was unusual. She testified that appellant had a pattern of calling the doctor's office for an appointment claiming that Helen was sick. Then later in the day, she would call back and cancel the appointment. She testified that she also found abnormal the fact that Helen believed that she was removed from her mother's care because she didn't keep the newspapers off the floor. Dr. Singer opined that appellant did not have the ability to properly parent Helen. She also stated that she was overwhelmed with the responsibility of being a single parent and would not ever be able to provide a secure home for Helen.

Dr. Gary Stollack, a family clinical psychologist, evaluated the results from court-ordered comprehensive psychological examinations performed on appellant and Helen. From appellant's responses to these tests, Dr. Stollack concluded that appellant exhibited symptoms of poor ego control. He testified that one moment appellant's responses indicated a person with a high intelligence, compassion, and sensitivity, then the very next moment, her responses indicated complete absence of control and breakthrough of impulses.

Dr. Stollack's clinical judgment was that appellant was a paranoid schizophrenic. He explained, however, that many functioning members of society are paranoid schizophrenics. He stated that, moreover, this condition was not conclusive proof of an inability to properly parent a child.

Dr. Stollack testified that Helen was a miniature replica of appellant. He stated that Helen had high intelligence but was grossly immature and suffered from poor ego control.

He described the relationship between Helen and appellant as one vacillating between detachment and extreme dependency. Dr. Stollack stated that he was also generally pessimistic about appellant's ability to provide an adequate psychological environment for Helen, even with the assistance of the best mental health programs.

Over appellant's objection, appellant's current psychologist, Dr. Nolan Singleton, also testified at the hearing. Dr. Singleton testified that he began psychotherapy with appellant in September, 1982. He also testified that he would observe Helen and appellant interact for one hour, then he and appellant would meet separately to discuss what he had observed.

Dr. Singleton described appellant as an extremely litigious person who feels victimized and consistently finds fault with members of the professional community. He diagnosed her as having a paranoid personality disorder which was symptomatic of neither a mental illness nor mental deficiency but was an impairment in her ability to function from day to day.

Dr. Singleton testified that he felt that appellant's disorder was responsive to therapy although progress would be slow until she overcame her general mistrust of other people. He observed that appellant interacted with Helen better than with other people and that she often demonstrated appropriate parenting of Helen.

Dr. Singleton testified that appellant was able to implement and maintain his suggestions concerning how to control Helen's behavior. He stated that although he never observed anything in Joyce's and Helen's relationship that he would consider "weird" or "strange", he did observe appellant's intermittent preoccupation with her per-

sonal problems which seemed to detract from her attention to Helen. Dr. Singleton stated that he did not feel that this was a major problem, however.

Dr. Singleton testified that there was a chance that appellant could provide a fit home for Helen in spite of her characterological disorder, if Helen could become involved in a good day care program and if appellant received "massive human support" services from DSS.

Other evidence considered by the probate court in this proceeding consisted of reports by various social workers and psychologists who had worked with Helen and/or appellant. A report written by Shealah Treece in 1980 indicated that appellant was hospitalized in 1964 and 1965 for depression resulting from thyroid medication. During her hospitalization she received psychotherapy, electroconvulsive therapy and medication. She was discharged in 1965 because her condition improved but the prognosis was guarded.

Dr. Mary Jane Keller, a psychologist for the Bureau of Vocational Rehabilitation, saw appellant in 1975. She wrote that appellant was one of three children and that both of her parents worked in factories. One brother is severely retarded and now hospitalized. The other brother is a pharmacist. Dr. Keller described appellant as being highly intelligent but suffering from depression and therefore recommended psychotherapy.

In 1978, Dr. Rom Kriauciunas, also evaluated appellant for the Rehabilitation Center. He reported that her work history included 10 years as office-clerical help, one year as a waitress, some babysitting and 3 years as a licensed practical nurse. He found her highly intelligent but with an "immature personality" described as egocentric, irritable and complaining. He further noted that

she has a strong feminine interest pattern, is generally passive and has a masochistic willingness to accept burdens. He also remarked that at the time she was enthusiastic and impatient with a mild hyperactivity in her speech and mannerisms. Dr. Kriauciunas recommended that she undergo psychotherapy in order to "free up some of her creative potentials and put her superior intellectual resources to a creative use".

In 1980, Dr. Keller again evaluated appellant. She concluded from the test results that appellant is litigious, angry, and with profound unmet dependency needs. Dr. Keller also concluded that appellant can be mendacious and has absolutely no insight. Dr. Keller indicated that while appellant has an above average intelligence, she suffers from a thought disorder characterized by circumstantiality, loosening of associations and inappropriate responsiveness to nonrelevant stimuli. Dr. Keller concluded that appellant was profoundly disturbed and recommended that appellant not have sole custody of Helen. Dr. Keller would not say whether appellant's condition was refractory to treatment until she reviewed more of appellant's records. Dr. Keller did state, however, that terminating appellant's parental rights would not be in appellant's best interests.

Based upon the foregoing evidence, the probate court terminated appellant's parental rights. The probate court concluded that appellant is not able to provide a fit home for Helen because of neglect, that there has been long-standing neglect, and that appellant is a serious threat to the long-term future and emotional well-being of Helen.

A probate court's decision to terminate parental rights is reviewed under the clearly erroneous standard. *In re Cornet,* 422 Mich 274, 277; 373 NW2d 536 (1985). In other words, this Court will

not set aside findings of fact made by a trial court sitting without a jury unless the findings are clearly erroneous. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Cornet, supra,* p 278, quoting *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds in subsection 19a of the juvenile code, MCL 712A.19a; MSA 27.3178(598.19a), has been met by clear and convincing evidence. Once the statutory grounds for termination have been met, the trial court must then consider the best interests of the child. *In the Matter of Schejbal,* 131 Mich App 833, 836; 346 NW2d 597 (1984); *In the Matter of McDuel,* 142 Mich App 479, 488; 369 NW2d 912 (1985).

The probate court, in the case *sub judice,* terminated appellant's rights on the basis of neglect. MCL 712A.19a(e); MSA 27.3178(598.19a)(e). We conclude that terminating appellant's parental rights on this basis was clearly erroneous.

"[A]n order for permanent custody due to neglect must be based upon testimony of such a nature as to establish or seriously threaten neglect of the child for the long-run future." *Fritts v Krugh,* 354 Mich 97, 114; 92 NW2d 604 (1958). The word "neglect" as used in the statute entails some degree of culpability by way of either intentional or negligent disregard of the child's needs. *In the Matter of McDuel, supra,* p 485. Sheer inability to fulfill parental duties does not constitute neglect. Rather, to be neglectful within the meaning of the statute, the parent must have committed some act or omission which is blameworthy. 142 Mich App

486. See also *In the Matter of Moore,* 134 Mich App 586, 593; 351 NW2d 615 (1984); *In the Matter of Bailey,* 125 Mich App 522, 527; 336 NW2d 499 (1983).

While we agree with the probate court that appellant has failed to provide a fit home for Helen, we do not agree that her failure is culpable or blameworthy.

The court wrote that no single act by appellant was so grave as to establish serious neglect of Helen. Rather, it was the compilation of many of appellant's actions and their effect on Helen and her development in society that established serious neglect of Helen for the long-term future and a serious present deprivation of Helen's emotional well-being. We summarize and address each of the court's findings *seriatim.*

1. *Joyce's Long-Term Characterological Disorder.*

The bulk of the trial court's findings concerned appellant's characterological disorder and the physical manifestation of this disorder in her personality and day-to-day life.

In *In the Matter of McDuel, supra,* this Court concluded that the physical incapacity of a parent to provide for the child's needs does not constitute neglect within the meaning of the statute where there has been no culpable disregard of duty by the parent. In the case at bar, we cannot conclude that a characterological disorder makes the parent any more culpable than a physical incapacity where the proofs do not establish some act or omission which is blameworthy. See also *In the Matter of Moore, supra,* p 599.

The present record is devoid of any acts or omissions so blameworthy as to rise to the level of culpable neglect. Appellant's characterological condition appears to have its roots in her childhood

and is the result of a long-ingrained pattern of having certain unmet needs. Appellant is cognizant of her problems and has undergone psychotherapy both voluntarily and pursuant to a court order.

Because of her disorder, appellant is continually embroiled in strife with the rest of society but she has carved a special place in her stressful world for Helen. As the probate court found, appellant loves Helen, wants to meet her every need, believes she can provide well for her and raise her appropriately with available supportive services.

While the probate court did find that Helen had been emotionally damaged because of appellant's disorder, it did not find that the damage was done intentionally. Moreover, it would appear that the involuntary nature of appellant's disorder combined with appellant's love for Helen and her willingness to undergo psychotherapy precludes a conclusion of culpable neglect.

### 2. *Unstable and Unsuitable Housing Conditions.*

While appellant moved repeatedly after Helen was born and her home was often cluttered, we do not find this to be proof of neglect. Whether the conditions were actually suitable or not, the bulk of the moves were motivated by Joyce's desire to provide a better environment for Helen. We are loathe to conclude that the manifestation of such a desire constitutes culpable neglect.

### 3. *Other Inconsistencies in Appellant's Parenting.*

We know of no parent who is perfect all of the time. The instances cited by the probate court in derogation of appellant's ability to parent are either the results of honest mistakes or are related to Joyce's characerological disorder. None of the instances resulted in intentional abuse of Helen.

In summary, we hold that the court's findings

have support in the record but that the findings do not support a conclusion of neglect as defined under the juvenile code. Appellant is an emotionally disturbed person whose condition must certainly improve before Helen is allowed to return to her sole custody, but appellant has done nothing that equates with culpable neglect. Therefore, we reverse the decision of the probate court and reinstate appellant's parental rights.

The next issue we address is whether the trial court erred in ordering appellant's treating psychologist, Dr. Singleton, to testify in abrogation of the psychologist-patient privilege. At the termination hearing, the DSS contended that the privilege was abrogated by § 11 of the Child Protection Law, MCL 722.631; MSA 25.248(11). Citing *In the Matter of Atkins,* 112 Mich App 528; 316 NW2d 477 (1982), *lv den* 413 Mich 912 (1982), appellant argued that § 11 did not abrogate the privilege because her treatment with her psychologist was not the result of any action taken under the Child Protection Law.

Relying upon *In the Matter of Baby X,* 97 Mich App 111; 293 NW2d 736 (1980), the probate court ordered appellant's psychologist to testify, holding that, even if § 11 was not applicable, a parent's right to confidentiality must give way to the best interests of a child in a neglect proceeding.

We hold that neither the Child Protection Law nor the authority of *In the Matter of Baby X, supra,* is a correct basis for abrogating the psychologist-patient privilege here and that the trial court erred in ordering appellant's psychologist to testify.

The Child Protection Law requires certain professionals to report suspected child abuse or neglect to the proper authorities. MCL 722.623; MSA 25.248(3). Section 11 of the act further abrogates

all legally recognized privileges except that between attorney and client so that they "shall neither constitute grounds for excusing a report otherwise required to be made nor for excluding evidence in a civil child protective proceeding resulting from a report" made pursuant to the act. MCL 722.631; MSA 25.248(11).

We do not believe that § 11 completely abrogates the psychologist-patient privilege in all child protective proceedings which may have originated by a report made pursuant to the Child Protection Law. Rather, in keeping with the intent of the Legislature to encourage the reporting of child abuse and neglect by all persons, OAG, 1978, No. 5297, p 430, 433 (April 28, 1978), we hold that § 11 abrogates a privilege only where a report is required under the act or where the communications subject to a privilege are offered as evidence of neglect or abuse in a child protective proceeding. See OAG, 1978, No. 5406, pp 724-726 (December 15, 1978).

Because Dr. Singleton's testimony in the case at bar neither concerned a report made pursuant to the Child Protection Law nor consisted of evidence of neglect or abuse, § 11 is an inappropriate basis for ordering Dr. Singleton to testify in abrogation of the psychologist-patient privilege.

Nor does our decision in *In the Matter of Baby X, supra,* provide the authority for abrogating such a privilege. The child in that case began exhibiting symptoms of drug withdrawal within 24 hours after its birth, prompting the probate court to take jurisdiction of the child. On appeal, the mother claimed that her right to confidentiality as a drug abuse patient was impaired by the admission into evidence of her drug addiction record.

This Court noted the conflict between Michigan law favoring disclosure of such records in child

protective proceedings, MCL 722.631; MSA 28.248(11), and federal law providing confidentiality for drug treatment, 21 USC 1175. The court resolved the conflict between federal and state law on the basis of 25 USC 1175(b)(2)(c) which authorizes abrogation of the privilege against disclosure in 25 USC 1175(a) upon a showing of good cause. The Court thus held that "in neglect proceedings confidentiality must give way to the best interest of the child" where treatment records are "necessary and material" to the state's proof of neglect. 97 Mich App 120.

In the instant case, there is no Michigan statute which authorizes abrogation of the psychologist-patient privilege upon a showing of good cause. Moreover, Dr. Singleton's testimony was not "necessary and material" to the state's proof of neglect. Therefore, the probate court erred in ordering Dr. Singleton to testify on this basis.

The admission of Dr. Singleton's testimony, however, was harmless beyond a reasonable doubt for the same reason that it should not have been admitted—it was not necessary or material to the state's proof of neglect. At most, Dr. Singleton's testimony corroborated the findings of other psychologists whose reports or testimony were admitted in the hearing. The testimony was therefore more cumulative to the evidence than dispositive of the court's decision to terminate appellant's parental rights.

Appellant's final argument on appeal is that the trial court erred in ruling that the Child Protection Law abrogated the confidentiality of DSS records and in ordering the testimony of DSS workers regarding the contents of those records.

At the hearing, the DSS offered its records relating to appellant's receipt of ADC to show that appellant had changed residences numerous times

since Helen's birth. When called to testify as to the contents of the DSS records, the DSS worker read a prepared objection, referring to both federal and state law providing for the confidentiality of DSS records.[2] In response, the probate court found that while the records were confidential, that confidentiality was abrogated by the Child Protection Law, *supra,* and ordered the DSS worker to testify.

We agree that the Child Protection Law is not a basis for abrogating the confidentiality attached to these records. The records did not pertain to any evidence of abuse or neglect. (See discussion under second issue, *supra.)*

However, the admission of this testimony did not prejudice appellant. The DSS worker testified only to appellant's many addresses, information which could have been secured by any member of the public who submitted a signed application therefor. MCL 400.64(1); MSA 16.464(1). Moreover, through the testimony of other witnesses, evidence that appellant had moved several times was already before the court. Therefore, this issue does not compel reversal.

For the foregoing reasons, the decision of the probate court terminating appellant's parental rights is reversed.

---

[2] MCL 400.35; MSA 16.435 provides:

"[R]ecords relating to categorical assistance, including medical assistance, shall be confidential and shall not be open to inspection except the state department of social services may promulgate and enforce rules for the use of the records as may be necessary for purposes related to federal, state or local public assistance."

MCL 400.64(1); MSA 16.464 further provides in pertinent part that "[a] person shall not utter or publish the names, addresses, or other information regarding applicants or recipients except in cases where fraud is charged or wrongful grant of aid is alleged". These statutes were enacted in compliance with § 402(a)(9) of the federal Social Security Act and § 205.50 of Chapter II, Title 45, Code of Federal Regulations, promulgated to implement that section of the Social Security Act.