## In re SPRINGER

Docket No. 100376. Submitted August 3, 1988, at Lansing. Decided
    October 18, 1988.

The Michigan Department of Social Services filed a petition in
the Wayne County Probate Court, Juvenile Division, seeking an
order terminating the parental rights of Marion Springer and
Reginald Reed to their three minor children, Natashia, De-
Shaunna and Cheris Springer. The petition was filed after
Marion Springer's twenty-one-month-old twin daughters died of
malnutrition and neglect. Marion Springer was thereafter
found guilty but mentally ill of two counts of involuntary
manslaughter for the twins' deaths in the Recorder's Court for
the City of Detroit. Following hearings, the probate court,
James E. Lacey, J., entered an order terminating parental
rights. Marion Springer, hereafter respondent, appealed.

The Court of Appeals *held:*

1. The probate court's decision to terminate respondent's
parental rights was not clearly erroneous. The statutory
grounds for termination were proven by clear and convincing
evidence.

2. The Department of Social Services adequately considered
the competing interests in deciding on a treatment modality to
be used in this case and did not fail to provide sufficient help to
respondent in attempting to reunite respondent with her chil-
dren.

Affirmed.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS.

A trial court, in order to terminate a party's parental rights,
must find that at least one of the statutory grounds for termi-
nation of parental rights has been met by clear and convincing
evidence; the state bears the burden of proving by clear and
convincing evidence that termination is warranted.

REFERENCES

Am Jur 2d, Parent and Child §§ 7, 34, 35.
Validity of state statute providing for termination of parental
rights. 22 ALR4th 774.

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — AP-
PEAL.

 The appropriate standard of review in cases involving termina-
tion of parental rights is whether the findings of the probate
court are clearly erroneous; a finding is clearly erroneous
where, although there is evidence to support it, the reviewing
court on the entire evidence is left with the definite and firm
conviction that a mistake has been made.

*John D. O'Hair,* Prosecuting Attorney, *Timothy
A. Baughman,* Chief of the Criminal Division,
Research, Training and Appeals, and *Ernest O.
Hornung,* Assistant Prosecuting Attorney, for peti-
tioner.

*Richard R. Harris,* for respondent.

*Christina Vadino,* for the minor children.

Before: DANHOF, C.J., and CYNAR and G. R.
DENEWETH,* JJ.

PER CURIAM. Respondent, Marion Springer, ap-
peals as of right from a Wayne County Probate
Court, Juvenile Division, order terminating her
parental rights to her three minor children,
Natashia Jewellyn Springer, born June 23, 1977,
DeShaunna LaFleurette Springer, born November
24, 1978, and Cheris Amberlaan Springer, born
March 11, 1980. The children's father, Reginald
Reed, has not appealed the order terminating his
parental rights. We affirm.

 A neglect petition was filed on behalf of the
three minor children on April 13, 1983. The peti-
tion was filed after respondent's twenty-one-
month-old twin daughters, Staci and Steffanie,
died of malnutrition and neglect. Paragraph B of
the petition, which was subsequently stipulated to
by respondent, states:

---

 * Circuit judge, sitting on the Court of Appeals by assignment.

On March 19, 1983, the mother walked into Detroit Receiving Hospital—Crisis Center, and reported that her twin daughters, Staci and Steffanie, were dead and could be found in the basement of her home (761 Marlborough, Detroit), in plastic bags. The mother stated that on March 7, 1983, at 5:00 A.M., she discovered that Staci was dead in her crib. The mother stated that on March 7, 1983, Steffanie was alive, but when she picked the child up and attempted to feed the child Kool-Aid, the child started choking and died in her arms. The mother stated that she then placed her dead children in the plastic bags in the basement until March 19, 1983, when she decided to report the children's deaths. On March 19, 1983, the children were found dead as reported by the mother in the basement of her home. The physical condition of the children indicated that they had been dead for at least several days.

On April 29, 1983, following a preliminary hearing, the three minor children were placed in foster care. The children have continuously remained in foster care from that date to the present time.

On May 23, 1984, respondent was found guilty but mentally ill of two counts of involuntary manslaughter in Detroit Recorder's Court. Respondent was sentenced to five years of probation with the first year to be spent at Project Transition. Respondent was also required to get psychiatric help.

On June 27, 1984, the probate court entered an order making the minor children temporary wards of the court. Additionally, respondent was directed to participate in psychiatric counseling.

After petitioner filed petitions for termination of respondent's parental rights and permanent custody, the permanent custody hearings commenced on May 7, 1986. It was revealed that the deceased twins weighed approximately seven and nine pounds respectively at the time of their deaths.

According to Dr. Herman Schornstein, M.D., those weights were extremely low for children of twenty-one months and indicated that the twins were probably starved over a long period of time.

Nancy Miller, a clinical social worker, testified that she was the children's therapist at the time of trial. Natashia had expressed confusion, sadness, and anger about the death of the twins. Ms. Miller testified that all of the children were extremely traumatized by the twins' deaths and indicated that such trauma could take a lifetime to repair. She believed that the children needed a safe environment where they could feel loved and nurtured. Ms. Miller further stated that the children would need to perceive their caretaker as trustworthy and consistent or else they would experience trauma in that person's care.

Carol Hempstead, the children's therapist from April, 1985, through January, 1986, testified that the children had behavioral problems especially after visits with respondent. All three children stated that they did not want to live with respondent. The children were afraid of respondent and indicated that respondent once locked them in a room by tying the door shut with a rope. Natashia had clear recollections of the twins' deaths and the manner in which respondent had concealed their bodies. Ms. Hempstead testified that family therapy with respondent and the children was not appropriate and could cause the children more trauma. Ms. Hempstead believed that the children's mental health would deteriorate if they were returned to live with respondent.

Natashia Springer testified that she did not want to live with respondent because she had killed her twin sisters. Natashia was afraid that respondent might also starve her. She recalled an

incident where respondent locked her in a room by tying the door shut with a jump rope.

Cheris Springer testified that she did not want to live with respondent because she killed her little sisters. DeShaunna Springer indicated that she was not living with respondent because respondent killed the babies. DeShaunna did not want to live with respondent because she locked her and Natashia in a room by tying the door with a jump rope.

Catherine Kaufman-Schoof, the children's foster care supervisor, testified that respondent's visits with the children became negative after respondent was charged with the deaths of the twins. The children felt that respondent had lied to them about the disappearance of the twins and no longer trusted respondent. Respondent's visits with the children centered around the gifts respondent brought. Natashia wanted the visits with respondent to end. Natashia thought that respondent was trying to bribe her with gifts. Ms. Schoof observed that the essential elements of a parent-child relationship were lacking in this case. She felt that respondent could not meet the emotional needs of her children or cope with their negative emotions. Ms. Schoof did not see any potential for rehabilitation within the next three to four years.

Dr. Mohammed Farrag, respondent's psychologist, has been treating respondent since September, 1984. Dr. Farrag never observed respondent and the children together. Respondent told him that her relationship with the children was generally positive. Dr. Farrag opined that respondent would need in-the-home support to cope with the stress of having the children returned to her. He recommended family counseling with the respondent and the children for one to two years before the children could return to respondent. Dr. Far-

rag further recommended one to two years of monitoring and counseling after the children were returned to respondent.

Diane Buffalin, a psychologist with the Wayne County Clinic for Child Study, performed a psychological evaluation of respondent in December, 1985. Ms. Buffalin found a significant impairment of respondent's ability to parent. Ms. Buffalin felt that respondent does not have an adjustment disorder but that she has a severe pathology that interferes with her ability to perceive reality. She opined that respondent is probably suffering from atypical schizophrenia. Ms. Buffalin believed that respondent was emotionally abusing the children by not responding to them as individuals with their own thoughts and needs. She indicated that the problem would continue and worsen with stress if the children lived with respondent.

Dr. Herman Schornstein, M.D., a psychiatrist, evaluated respondent and her children on two occasions. Dr. Schornstein diagnosed respondent as having a schizo-affective type of schizophrenia. Dr. Schornstein testified that respondent's mental illness could be treated if she accepted the fact that she has an illness. He indicated that respondent has not accepted her illness and the children are very uncomfortable with her. Dr. Schornstein noted that the children need treatment to work through the death of their sisters. He further noted that one child had a traumatic reaction when a dead mouse was found in her school and she smelled the odor of the mouse. Dr. Schornstein stated that the children should not be returned to respondent because respondent does not recognize her illness.

Respondent testified that she was in the hospital for about two weeks after the twins were born. Some of the doctors suggested that she submit to

psychological testing at that time but she refused. A social services worker, Al Heintzelman, threatened to take her children and make them wards of the court. Respondent received in-home help for a year and the twins were healthy. After the day care was cancelled, respondent began to have problems with one of the twins. Steffanie played games with her and would not eat her food. The twins then began to smear the contents of their diapers all over the room and it would take respondent several hours to clean it up. Respondent noticed that the twins were smaller than normal and that they were developmentally slow. She considered putting them up for adoption in the winter of 1982. In early 1983, the twins began vomiting and having diarrhea. Respondent was aware of the twins' sickness for several days and discussed their health with her relatives. She had considered phoning a doctor to make a house call but she did not because the house was dirty and did not smell good. Also, she was concerned about her appearance because she had not bathed in a week or washed her hair for six months. Before she could take the twins to the hospital, they died on March 5, 1983. She concealed the bodies in plastic bags in the basement until she notified the authorities of the twins' deaths on March 19, 1983. On the day the twins died, she told the other children that the doctor had taken the twins to get help.

On April 17, 1987, the probate court terminated respondent's parental rights to Natashia, De-Shaunna, and Cheris pursuant to MCL 712A.19a, subds (c), (d), and (f); MSA 27.3178(598.19a), subds (c), (d), and (f).

On appeal, respondent contends that the probate court's decision to terminate her parental rights was clearly erroneous.

MCL 712A.19a; MSA 27.3178(598.19a) provides in relevant part:

> Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the child in the permanent custody of the court, if it finds any of the following:
>
> \* \* \*
>
> (c) A parent or guardian of the child is unable to provide proper care and custody for a period in excess of 2 years because of a mental deficiency or mental illness, without a reasonable expectation that the parent will be able to assume care and custody of the child within a reasonable length of time considering the age of the child.
>
> (d) A parent or guardian of the child is convicted of a felony of a nature as to prove the unfitness of the parent or guardian to have future custody of the child or if the parent or guardian is imprisoned for such a period that the child will be deprived of a normal home for a period of more than 2 years.
>
> \* \* \*
>
> (f) The child has been in foster care in the temporary custody of the court on the basis of a neglect petition for a period of at least 2 years and upon rehearing the parents fail to establish a reasonable probability that they will be able to reestablish a proper home for the child within the following 12 months.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds in MCL 712A.19a; MSA 27.3178(598.19a) has been met by clear and convincing evidence. *In re Tedder,* 150 Mich App 688, 698; 389 NW2d 149 (1986), lv den 426 Mich 874 (1986). The state bears the burden of proving by clear and convincing

evidence that termination of parental rights is warranted. *In re Riffe,* 147 Mich App 658, 671; 382 NW2d 842 (1985), lv den 424 Mich 904 (1986). The appropriate standard of review in cases involving termination of parental rights is whether the findings of the probate court are clearly erroneous. *In re Cornet,* 422 Mich 274, 277; 373 NW2d 536 (1985). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *In re Riffe, supra.*

After reviewing the record of the instant proceedings, we are convinced that the trial court's decision to terminate respondent's parental rights was not clearly erroneous. We find that the statutory grounds for termination of parental rights were proven by clear and convincing evidence in this case. The record indicates that, because of her continued mental illness, respondent will be unable to assume care and custody of her children within a reasonable length of time. Additionally, respondent was convicted of a felony of such a nature as to prove her unfitness to have future custody of the children. Furthermore, the children have been in foster care on the basis of a neglect petition for over two years and respondent would not be able to reestablish a proper home for them within the following twelve months. Thus, we find no error.

Respondent also argues that the Department of Social Services did not do all that it could to reunite respondent with her children. It is the policy of this state to keep children with their natural parents whenever possible. *In re Brown,* 139 Mich App 17, 20; 360 NW2d 327 (1984). MCL 712A.1; MSA 27.3178(598.1) provides in relevant part:

> This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control, preferably in his own home, as will be conducive to the child's welfare and the best interest of the state and that when such child is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to the care which should have been given to him by them.

Respondent contends that the Department of Social Services utilized an inappropriate treatment modality and encouraged a breakdown in the relationship between respondent and her children. However, we find that respondent's contention is not supported by the record. Our examination of the record reveals that the Department of Social Services adequately considered the competing interests in deciding on a treatment modality to be used in this case and did not fail to provide sufficient help to respondent in attempting to reunite respondent with her children.

Affirmed.